**CONSOLIDATED FLOORING SER-VICES and Monroe Schneider Associates–Texas, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**Nos. 94–352T, 95–1T.**

United States Court of Federal Claims.

Aug. 21, 1997.

Martin A. Schainbawn, San Francisco, CA, for plaintiff, with whom was David B. Porter, of counsel.

David R. House, Tax Division, United States Department of Justice, Washington, DC, with whom on the brief were Mildred L. Seidman, and Loretta C. Argrett, Assistant Attorney General, for defendant.

*OPINION*

MARGOLIS, Judge.

This tax refund action, which is currently before the Court following a trial, presents two primary issues. First, the Court must determine whether, for tax years 1989–1992, those people with whom plaintiff contracted to install floor coverings ("installers") were employees or independent contractors for federal income tax purposes. Second, the Court must determine whether plaintiff is the statutory employer of those employees ("helpers") who were employed by the installers.

### CONTENTIONS OF THE PARTIES

Plaintiff claims that its carpet installers are independent contractors under federal law and that defendant owes plaintiff a refund in the amount of $417,239.77 for the amount plaintiff overpaid in employment taxes for tax years 1989–1992. Plaintiff also contends that a closing agreement between a different carpet installation company, owned by the same parent holding company that now owns Consolidated Flooring Services ("CFS"), and the Internal Revenue Service ("IRS") requires the IRS to treat CFS' installers as independent contractors. Further, plaintiff alleges that the IRS has a constitutional obligation, under the Equal Protection Clause of the Fifth Amendment, to classify CFS' installers as independent contractors because the IRS treats similarly situated carpet installers at other companies, in other states, as independent contractors.

Defendant United States contends that CFS employs the installers and their helpers, and that the installers are CFS employees for federal tax purposes. Defendant also maintains that plaintiff's claims regarding the closing agreement, and for violation of the equal protection guarantees of the United States Constitution, are both meritless and barred by the doctrine of variance. Further, defendant alleges that, if CFS employs the installers and their helpers, plaintiff has erroneously designated 40 percent of the compensation paid to installers as reimbursement for expenses rather than as wages. Finally, the United States contends that plaintiff is liable for negligence and failure to

deposit penalties respecting erroneous designation of compensation as reimbursement for expenses. Consequently, defendant counterclaims for $4,228,723.31.

Trial was held from October 29 through 31, 1996 in San Francisco, California. The Court concludes that plaintiff's installers are independent contractors for federal income tax purposes. Plaintiff, therefore, is due a refund for amounts overpaid to the government in this regard. Because the Court finds that plaintiffs' installers are independent contractors under federal law, the Court does not reach any of plaintiffs' other arguments regarding tax treatment of the installers, nor defendant's defenses to plaintiff's other arguments. However, the Court also holds that plaintiff is the statutory employer of the installer's helpers. Plaintiff is, therefore, liable for employment taxes that should have been paid and withheld with regard to these individuals, but were not.

### FACTS

In 1986, M.S.A. § Industries, Inc. became the holding company for companies that included Monroe Schneider Associates ("MSA"), Monroe Schneider Associates–Texas ("MSA–TX") and plaintiff, Consolidated Flooring Services ("CFS").[1] Both M.S.A. § and CFS are businesses that, in large part, provide and install floor covering in California. Although both M.S.A. § and CFS operate in overlapping geographical areas and provide similar services, they each provide a different product.

MSA provides customers with union employees to install floor coverings, while CFS contracts with non-union installers to install floor coverings. MSA pays its union employees by the hour and keeps strict control of the manner, timing, and order in which its employees complete their installations. CFS pays non-union installers on a per job basis and does not maintain rigid control over the manner or sequence in which floor covering is installed. Barry Schneider, the president and chief operating officer of CFS during the years in suit pointed out that, ideally, cus-

tomers would view CFS as providing a less expensive, though perhaps lesser quality, alternative to the union installers at MSA. Thus, the two companies essentially offer two different products, and were incorporated under different names to help customers differentiate between them.

### Installers and Helpers

CFS installed floor covering on a contract basis. A customer would contract with CFS to install flooring material at an agreed upon price. CFS would then contract to purchase both labor and material. On the labor side, contractors—the "installers"—would arrive at CFS' warehouse early in the morning to obtain installation jobs from CFS' labor superintendent. An installer scheduled for a job might, or might not, arrive at CFS' warehouse in the morning to pick up material.

CFS kept a list of contractors that included information such as where the contractors lived and in what types of work the contractor specialized. Installers filled out forms indicating their address, hours of availability, their area of expertise, and whether they had transportation and tools necessary to complete installation jobs. These forms were typically generic stationery forms entitled "Application for Employment." CFS also required that installers contracting with CFS have pagers so that CFS could reach installers if jobs became available. Installers had responsibility for, and ownership of, the pagers. Installers were free to accept or reject jobs. Further, installers could, and did, work for floor covering installation companies other than CFS. CFS did not penalize installers who worked for companies other than CFS.

After accepting an installation job, contract installers would complete an installation job using a work crew of "helpers." Helpers were selected, hired, and fired by the contract installers. Installers set the manner and rate of pay for the helpers. Installers, rather than CFS, supervised the helpers on the job. Although CFS might suggest that an installer hire or fire a particular helper,

---

**1.** The United States concedes liability with respect to the claims of Monroe Schneider Associates–Texas ("MSA–TX"), subject to verification by the IRS of the amounts claimed by MSA–TX. All references in this opinion to "plaintiff," therefore, refer to CFS.

the ultimate decision remained with the installer.

Installers would transport the material to be installed to job sites using the installers' own vehicles. Installers used their own tools and supplies to install the floor covering. CFS offered installers the opportunity to purchase supplies from CFS, but installers were not required to purchase supplies from CFS and often did not. When installers did purchase supplies, the cost was deducted from the money paid by CFS to the installers for the jobs the installers completed. Supplies purchased from CFS were used on jobs other than those obtained from CFS.

When they were on a CFS job, CFS required installers and helpers to wear uniforms consisting of shirts with the CFS name on them. Installers paid for, and owned, the shirts. Though these shirts were not always worn, neither the installers nor their helpers were penalized for failing to wear the shirts.

Other than requiring that installation conform to the contract specification, CFS had no control over the manner in which the installers chose to install floor covering. Subject to the preference of customers that a job be done a particular way, or at a specific time, installers controlled the method and sequence of floor covering installation.

CFS did offer installers training designed to qualify installers to install a particular manufacturer's product. Training and certification were not required in any particular method or product, but failure to obtain certification could prohibit installers from receiving jobs using those products where the manufacturer of a particular product refused to warranty its product in the absence of such certification. CFS did not pay for the training provided by carpet material suppliers.

Installers bore the risk of profit or loss on the jobs they took. Although CFS distribut-

ed lists of suggested prices for jobs, the final price was negotiated between CFS and the installers. Installers were paid on a "per job" basis. Submission of an invoice indicating completion of a job was requisite for payment. If an installer did extra work on a job, he was paid based on a separately negotiated contract. Where a customer required an installer to remedy a faulty job, the installer bore the expense of the extra work.[2]

### State Law Licensing Requirements

Sometime during 1987, the California Employment Development Division ("CEDD") audited CFS. CEDD informed CFS that—despite their functional similarity—all non-licensed carpet installers would be treated as employees for state tax purposes, while all licensed installers could continue to be treated by CFS as independent contractors. Because California reclassified non-licensed installers as employees, CFS believed that the non-licensed installers, under state law, could no longer employ or provide workers' compensation for themselves or their helpers. In an effort to comply with California and CEDD mandate while preserving the functional independence of the installers with whom CFS worked, CFS began withholding on 60 percent of the monies paid to its non-licensed installers. Forty percent of the money paid to non-licensed installers was treated as expenses and was paid to the non-licensed installers without tax withholding, but subject to deduction for supplies purchased, if any, from CFS.

With five exceptions, deemed administrative errors, CFS did not offer any benefits—including vacation time, medical help, or a pension plan—to any of the approximately 95–96 installers with whom CFS contracted. At least one of the installers who did receive benefits carried those benefits, never re-

---

2. Although two disgruntled former CFS installers testified to a somewhat different set of facts, the Court found these witnesses' testimony to be biased, less than credible, and, at times, contradictory. These witnesses testified that they could not turn down jobs from CFS, that CFS paid them by the hour, and that CFS required them to perform their jobs in specific sequence and according to specific instruction. Yet, these same

witnesses later contradicted themselves testifying that the installers invoiced CFS based on the job, negotiated with CFS about the price of jobs, turned down jobs if the jobs were unprofitable, and controlled the manner and sequence in which jobs would be completed. Some of their testimony suggested that the installers hired and determined the pay of their helpers.

scinded, over from employment as a union employee at MSA.

As a result of the 1987 CEDD audit, CFS also changed the manner in which it paid installers. Before the audit, CFS would distribute one check to an installer in the amount of the invoice submitted by that installer on a given job. CFS provided installers with IRS Form 1099s, and installers would pay their helpers directly. After the audit, CFS would elicit from installers the amount to be paid to the installer's helpers. That amount would then be deducted from the invoice submitted by the installers for the jobs they had completed, and a separate check would be distributed to the installer's helpers. CFS withheld taxes on 60 percent of the wages paid to the helpers, but did not withhold on 40 percent of those same wages. Functionally, CFS continued to treat licensed and non-licensed installers the same.[3]

In 1993, CFS filed claims for refund of employment taxes paid on installers and their helpers for tax periods 1989–1992. In January 1994, CFS received a partial refund from the IRS. CFS then filed two actions, on May 27, 1994 and January 3, 1995, respectively, in the Court of Federal Claims seeking refund of the remaining, allegedly erroneously paid, employment taxes. Defendant has counterclaimed against plaintiff in both actions for allegedly erroneous refunds and assessed deficiencies.

### DISCUSSION

Under the current federal tax system, employers and employees are subject to a number of "employment" taxes. The Federal Insurance Contributions Act ("FICA") provides for a Social Security tax on employers and employees, 26 U.S.C. §§ 3101, 3111, and requires employers to withhold from wages FICA tax payments on behalf of their employees. 26 U.S.C. § 3102. The Federal Unemployment Tax Act ("FUTA") provides for unemployment taxes on employers. 26 U.S.C. § 3301 *et seq.* Further, employers must withhold federal income tax from wages paid to employees. 26 U.S.C. § 3402. These "employment taxes," however, apply only where payments are made from employers to employees; they do not apply to payments to independent contractors.

Where a tax assessment is challenged, the taxpayer bears the burden of proving that any taxes assessed were erroneous and the correct amount of the assessment. *United States v. Janis*, 428 U.S. 433, 440, 96 S.Ct. 3021, 3025, 49 L.Ed.2d 1046 (1976); *Helvering v. Taylor*, 293 U.S. 507, 514, 55 S.Ct. 287, 290, 79 L.Ed. 623 (1935). This Court has jurisdiction over claims for tax refund actions where, as here, a plaintiff has timely filed a claim for refund with the Internal Revenue Service. *See* 28 U.S.C. §§ 1346(a)(1) and 1491; 26 U.S.C. §§ 6511(a) and 7422(a).

### I. Independent Contractors, Employees, and the Common Law

Plaintiff contends that the non-licensed carpet installers with whom plaintiff contracted are independent contractors. Defendant maintains that plaintiff's non-licensed installers and helpers are employees and that plaintiff is their employer.

For federal tax purposes, common law principles distinguish independent contractors from employees. 26 U.S.C. §§ 3121(d)(2), 3306(i); 26 C.F.R. § 31.3121(d)–1; *see Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 3, 82 S.Ct. 1125, 1127, 8 L.Ed.2d 292 (1962); *Tristate Developers, Inc. v. United States*, 212 Ct.Cl. 486, 489, 549 F.2d 190 (1977); *William C. McCombs Co., Inc. v. United States*, 193 Ct.Cl. 644, 647, 436 F.2d 979 (1971); *Rayhill v. United States*, 176 Ct.Cl. 1120, 1127, 364 F.2d 347 (1966); *Illinois Tri–Seal Products, Inc. v. United States*, 173 Ct.Cl. 499, 510, 353 F.2d 216 (1965); *Institute for Resource Management, Inc. v. United States*, 22 Cl.Ct. 114, 115 (1990). The common law of employer-employee relations refers to "the general common law of agency, rather than ... the law of any particular state." *Nationwide Mutual Ins. Co. v. Darden*, 503 U.S. 318, 323 n. 3, 112 S.Ct. 1344, 1348 n. 3, 117 L.Ed.2d 581 (1992) (quoting *Community for Creative*

---

**3.** The IRS does not challenge the independent contractor status of licensed installers and their helpers, but does challenge the status of non-licensed installers and their helpers.

*Non–Violence v. Reid,* 490 U.S. 730, 740, 109 S.Ct. 2166, 2172–73, 104 L.Ed.2d 811 (1989)).

The United States Supreme Court has stated that whether a hired party is an employee under the general common law of agency requires the Court to:

consider the hiring party's right to control the manner and means by which the product is accomplished. Among the factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Reid,* 490 U.S. at 751–52, 109 S.Ct. at 2178–79 (citations omitted); *cf.* 26 C.F.R. § 31.3121(d)–1(c) (setting forth a similar test); Rev. Rul. 87–41, 1987–1 Cum. Bull 296, 298–99 (providing a twenty factor guide to help determine whether a hired party is an employee or independent contractor for tax purposes); Restatement (Second) of Agency § 220(2) (1958) (describing nonexhaustive factors relevant to determine whether a hired party is an employee or an independent contractor). "[A]ll of the incidents of the relationship must be assessed and weighed with no one factor being decisive." *Nationwide Mutual Ins. Co.,* 503 U.S. at 324, 112 S.Ct. at 1349 (*quoting NLRB v. United Ins. Co. of America,* 390 U.S. 254, 258, 88 S.Ct. 988, 990–91, 19 L.Ed.2d 1083 (1968)).

Our predecessor Court, the Court of Claims, a number of times has considered whether home improvement "installers" were employees or independent contractors under the common law test. *See e.g., Tristate Developers, Inc. v. United States,* 212 Ct.Cl. 486, 549 F.2d 190 (1977) (independent contractors); *William C. McCombs Co., Inc. v. United States,* 193 Ct.Cl. 644, 436 F.2d 979 (1971) (employees); *Powers v. United States,*

191 Ct.Cl. 762, 424 F.2d 593 (1970) (independent contractors); *Rayhill v. United States,* 176 Ct.Cl. 1120, 364 F.2d 347 (1966) (independent contractors); *Illinois Tri–Seal Products, Inc. v. United States,* 173 Ct.Cl. 499, 353 F.2d 216 (1965) (independent contractors). The installers in those cases were workers in positions sufficiently analogous to those of the flooring installers in this case such that the Court of Claims decisions in those cases provide helpful guidance. In particular, *Tristate Developers* and *McCombs* highlight the distinction between independent contractors and common-law employees.

In *Tristate Developers,* the plaintiff Tristate kept lists of installers with which it frequently contracted. 212 Ct.Cl. at 491, 549 F.2d 190. Customer contracts specified the price that would be paid, the work to be done, and the materials to be used on jobs completed by installers. *Id.* There was no competitive bidding for jobs, although prices were sometimes negotiated. *Id.* Tristate relied on installers to satisfy their customers, did not regularly supervise installers on the job, and required invoices signed by customers for payment. *Id.* at 492, 549 F.2d 190. With the exception of start and finish dates, the timing of work completed was left to negotiation between the installer and the customer. *Id.* at 491, 549 F.2d 190. Finally, installers worked for contractors other than Tristate. *Id.* at 492, 549 F.2d 190. Based on these characteristics, the Court of Claims concluded that the installers were independent contractors. *Id.* at 488, 549 F.2d 190.

By contrast, in *McCombs,* roofing and siding installers were found to be employees. 193 Ct.Cl. at 647, 436 F.2d 979. Although the relationship between the contractor and installers was similar in some ways to the relationship between the contractor and installers in *Tristate Developers,* there were significant differences. The most significant difference was the Court's finding that, in *McCombs,* the contractor employed salaried supervisors who would visit job sites to oversee and instruct installers on the job. *McCombs,* 193 Ct.Cl. at 650, 654, 436 F.2d 979 ¶ 6; *see also Tristate Developers, Inc.,* 212 Ct.Cl. at 494, 549 F.2d 190. Further, installers had been fired during the comple-

tion of a job because of faulty workmanship. *McCombs*, 193 Ct.Cl. at 651, 436 F.2d 979. The *McCombs* Court stated, "[o]ne who must learn his trade and acquire his tools from the person employing his services can hardly be classified as an independent contractor." *Id.* at 650, 436 F.2d 979.

■ Examination of the facts of this case in light of common law agency factors, *Tristate Developers, McCombs,* and other past precedent of the Court of Claims reveals that CFS' installers are independent contractors. CFS was created to offer customers an alternative to more expensive, though perhaps higher quality, flooring installation provided by installation companies utilizing union labor. By contracting out installation jobs, CFS has been able to operate more efficiently than some other installation companies while providing the opportunity for a new class of entrepreneur—the contract carpet installer—to evolve in California's carpet installation business.

Furthermore, CFS contracted with the carpet installers on a per job basis. Although CFS maintained a recommended price list for certain types of installations, these prices were negotiable. Installers negotiated prices for jobs, turned jobs down and worked without penalty for carpet installation companies other than CFS during the same time period they worked for CFS. Installers hired, supervised, and set the pay for those who helped them complete installation jobs. Installers owned and used their own tools and supplies.

CFS relayed customer instructions but did not control the manner or sequence in which flooring was installed. Although CFS provided work space for flooring product manufacturers to instruct installers about the manufacturer's flooring product, CFS neither required nor supervised training sessions.[4] As in *Tristate Developers,* CFS did not supervise installers on the job. *See Tristate Developers, Inc.,* 212 Ct.Cl. at 492 & n. 6, 549 F.2d 190. In fact, when customers expressed dissatisfaction with an installer's work product, the installer fixed the problem or was charged by CFS for the cost of remedy by

another installer. *See id.* In sum, the installers were independent business people who sought profit, and bore the risk of loss, in their flooring installation jobs.

The Court does note, however, that installers were not independent in all respects. A few installers, who switched employment from MSA to CFS appear to have retained membership in a pension plan. CFS issued Forms W–2, and withheld federal taxes from payment, to installers working on CFS jobs. Further, CFS had a policy that shirts with the CFS logo be worn on CFS jobs—although this requirement more likely had to do with safety and marketing concerns than control over the installers. In fact, those who did not wear CFS shirts did so without repercussion. Additionally, CFS sought to maintain lists with information about the installers it used. As in *Tristate Developers,* however, rather than controlling CFS' source of labor, these lists served to insure that jobs were given to capable contractors who would not require supervision. *See Tristate Developers,* 212 Ct.Cl. at 494, 549 F.2d 190. CFS also required installers to carry pagers so that CFS could contact the installers when jobs became available. Thus, in essence, where CFS did maintain some control, CFS was merely seeking to maintain a ready contingent of contractors able to complete jobs as CFS arranged for them.

In sum, the Court finds that CFS sought to maintain control over its installers only to the extent that CFS desired a ready, able, work force that could successfully complete installation jobs while marketing the CFS name. Installers retained their independence with respect to the sequence, manner, and skill with which jobs were completed. Installers bore the risk of profit or loss on their jobs and controlled their own work force. Under federal tax law and the common law of agency, the Court holds that the installers were independent contractors.

As indicated by the facts, CFS had even less control over the installer's helpers than CFS had over the installers. In fact, other than altering its payment procedure with

---

4. As noted previously, however, some manufacturers, required installers to receive instruction from the manufacturer as a prerequisite to manufacturer warranty of the product to be installed.

respect to installers and their helpers after 1987, CFS apparently had little or no contact with the installer's helpers. Accordingly, like the installers themselves, the installer's helpers were not CFS' common law employees.

## II. Statutory Employers

■ Defendant next contends that, even if the installers and helpers were not CFS' employees under the common law test, CFS was still the statutory "employer" of the installers' helpers because CFS controlled payment of the helpers' wages. In support of this proposition, defendant relies upon 26 U.S.C. § 3401(d)(1). Plaintiff generally disputes that the installers' helpers are CFS' employees or that CFS is their employer.

Section 3401(d) of Chapter 24 of the Internal Revenue Code, which governs the "Collection of Income Tax at Source on Wages," provides in pertinent part:

> (d) Employer.—For purposes of this chapter, the term "employer" means the person for whom an individual performs or performed any service, of whatever nature, as the employee of such person, except that—
>
> (1) if the person for whom the individual performs or performed the services does not have control of the payment of the wages for such services, the term "employer" (except for purposes of subsection (a)) means the person having control of the payment of such wages ...

Thus, although an "employer's" obligation to withhold and pay FICA taxes is normally governed by the common law of agency, § 3401 carves out an exception if a person for whom an individual performs services as an employee does not have control of the payment of wages for those services.[5] In such circumstances, § 3401 designates the "employer," for withholding purposes, as the person having control over the payment of wages. In deciding whether, in this case, CFS was responsible for paying and withholding taxes, therefore, this Court must determine whether CFS had "control of the payment of such wages."

In support of its contention that CFS was the employer of the installers' helpers, defendant cites *Otte v. United States*, 419 U.S. 43, 95 S.Ct. 247, 42 L.Ed.2d 212 (1974). In *Otte,* the Supreme Court addressed whether priority claims for wages earned by employees prior to an employer's bankruptcy, but unpaid at the inception of the bankruptcy proceeding, are subject to withholding taxes for which an employer is required to deduct and withhold pursuant to §§ 3102 and 3402. *Id.* at 44–51, 95 S.Ct. at 249–54. Answering this question in the affirmative, the Court stated that, "[t]he fact that services were performed for the bankrupt, rather than for the trustee, and the fact that payment is made after the employment relationship terminated, do[es] not convert the remuneration into something other than 'wages' as defined by·§ 3401(a) of the Internal Revenue Code." *Id.* at 49, 95 S.Ct. at 252. Though the Court noted that the language of 26 U.S.C. § 3401 "place[s] responsibility for withholding at the point of control," *id.* at 50, 95 S.Ct. at 253, no decision was made whether responsibility for withholding belonged to the trustee, the referee, or the bankrupt estate. *Id.* at 50–51, 95 S.Ct. at 253–54. The Court stated,

> [w]e need not determine whether it is the trustee, with his responsibility, under [the Bankruptcy Act,] ... for making recommendations and actual payments, or the referee, with his supervision over the general administration of the bankrupt estate, or the estate itself that has 'control of the payment of such wages' within the meaning of § 3401(d)(1) of the Internal Revenue Code. One of them is the 'employer' and, as such, has the duty to withhold or to order the withholding, as the case may be.

*Id.* at 51, 95 S.Ct. at 253. *Otte* points out that "an employer" under § 3401(d) is the person with "control over the payment of such wages," and such person is responsible for deducting and withholding taxes under §§ 3102 and 3402.

This Circuit has spoken with regard to the meaning of "control of the payment of

---

5. Section 3401(d) contemplates that the individual receiving *wages* be *someone's* employee. Based upon the facts presented at trial, the Court finds that the installers' helpers were the installers' common law employees.

wages," under § 3401(d)(1), only once. There, in *Arthur Venneri Co. v. United States*, the Court of Claims considered whether a prime contractor was an employer required to withhold taxes on wages received by employees of a subcontractor where the prime contractor deposited funds—representing advance payments on subcontracts—into a special bank account that was designated solely for the subcontractor to use to pay wages and other expenses arising out of the subcontracts. 169 Ct.Cl. 74, 76–77, 80–81, 340 F.2d 337 (1965). The prime contractor did not make any wage payments to the subcontractor's employees, and the subcontractor continued to prepare its payroll and disburse wages to its employees in the same manner as it had done before the special account was created. *Id.* at 77, 340 F.2d 337. Nor did the prime contractor determine who would be hired, fired, or employed, or the amount of the wage that would be paid to the subcontractor's employees. *Id.* at 80–81, 340 F.2d 337. The Court held that the prime contractor was not the employer of the subcontractor's employees. *Id.* at 81, 340 F.2d 337.

■ The Ninth Circuit addressed the phrase "control of the payment of such wages," for purposes of § 3401(d), in *Southwest Restaurant Systems, Inc. v. Internal Revenue Service*, 607 F.2d 1237 (9th Cir. 1979). In *Southwest Restaurant Systems*, there existed four separate corporations, one of which was in bankruptcy. *Id.* at 1238. The accounting, bookkeeping, and finances of all four corporations were handled by one bookkeeper who paid the wages of all four corporations from one payroll bank account maintained by the debtor. *Id.* The payroll bank account was funded by checks drawn by the bookkeeper against funds from other accounts for all four corporations. *Id.* The bookkeeper computed the payroll based on time cards sent to her from all four corporations and payment was based on a uniform pay scale according to the job performed. *Id.* Once computed, payroll sheets were then submitted to a computer service which printed salary checks to the employees, payable by the debtor. *Id.* The *Southwest Restaurant Systems* Court stated that, for purposes of 26 U.S.C. § 3401(d),

[n]o one other than the person who has control of the payment of the wages is in a position to make the proper accounting and payment to the United States. It matters little who hired the wage earner or what his duties were or how responsible he may have been to his common law employer. Neither is it important who fixed the rate of compensation. When it finally comes to the point of deducting from the wages earned that part which belongs to the United States and matching it with the employer's share of FICA taxes, the only person who can do that is the person who is in 'control of the payment of such wages.'

*Id.* at 1240. Ultimately, *Southwest Restaurant Systems* held the debtor corporation liable for deducting and withholding taxes as the employer of all four corporations' employees. *Id.* at 1239–40; *see also Winstead v. United States,* 109 F.3d 989, 990–92 (4th Cir.1997) (direct payment of wages from the checking account of a landowner to a sharecroppers' day laborers, for wages earned by the day laborers as employees of the sharecropper, made the landowner a statutory employer under 26 U.S.C. § 3401). This Court agrees with *Southwest Restaurant Systems'* statement that the person with control of the payment of wages is the person most able to make a proper accounting and to make payment to the United States.

While the ability to hire, fire, and set the wages for an employee is relevant to determining who controls the *wage* of an employee, it is not relevant to determining—as section 3401(d)(1) requires to be determined—who controls the *payment of wages*. Had Congress intended to define a statutory "employer" as the person who controlled, determined, or established an employee's wage—and in doing so place responsibility for paying and withholding employment taxes on that party—Congress could have so specified. But Congress did not so define "employer." Rather, Congress defined an "employer," for purposes of § 3401(d)(1), as the person in control of the *payment* of such wages.

■ Only the party with control of the account from which wages are paid can, ultimately, control the amount of payment and whether payment actually occurs. Further, the person who distributes wage payments from their account is the person best able to account for the amount of the distributions to employees, and to ensure that taxes are withheld on those payments. The Court holds, therefore, that the party with control over the payment of such wages under 26 U.S.C. § 3401(d)(1), is the party with control of the account from which wages are paid.

In the present case, CFS controlled the account, and therefore controlled the payment of wages to the installers' helpers. After 1987, CFS issued payment to the non-licensed installers' helpers, and withheld federal taxes on those payments, believing that CFS was obligated to do so because of California law and the CEDD audit. Payments to the helpers were drawn on CFS' account. Thus, even though the installers determined the wage paid to their helpers, CFS was the party which controlled the payment of those wages. Under 26 U.S.C. 3401(d)(1), therefore, CFS was the "employer" of the installers' helpers. As statutory employer under § 3401(d)(1), CFS was responsible for paying and withholding employment taxes on the installers' helpers.

### A. Reimbursement Designation

CFS withheld and paid employment taxes on 60 percent of the wages it paid to the helpers. Employment taxes were not paid, nor withheld, on 40 percent of the amount paid to the helpers because 40 percent was treated as reimbursement of expenses and not wages.

Title 26 U.S.C. § 3121(a) defines "wages" as "all remuneration for employment, including cash value of all remuneration (including benefits) paid in any medium other than cash" unless specifically excepted thereun-

der. Title 26, Code of Federal Regulations § 31.3121(a)–1(h) interprets 26 U.S.C. § 3121(a) and provides that reimbursements of ordinary and necessary expenses incurred in the business of the employer are not wages.

#### 1. Payments Prior to July 1, 1990

■ Respecting employer advances and reimbursement of expenses prior to July 1, 1990, 26 C.F.R. § 31.3121(a)–1(h) states,

[a]mounts paid specifically—either as advances or reimbursements—for traveling or other bona fide ordinary and necessary expenses incurred or reasonably expected to be incurred in the business of the employer are not wages. Traveling and other reimbursed expenses must be identified either by making separate payment or by specifically indicating the separate amounts where both wages and expense allowances are combined in a single payment.

Therefore, the 40 percent paid to the helpers, but upon which CFS neither withheld nor paid employment taxes—to the extent it reasonably constituted an estimate of reimbursed expenses and was identified separately from ordinary wages—could qualify to be excluded from wages under 26 U.S.C. § 3121(a) and, therefore, absolve CFS from liability for payment and withholding of employment taxes on that 40 percent. Defendant, however, contests CFS' 40 percent designation as unreasonable.[6] The Court disagrees with the defendant with respect to payments paid to, and received by, helpers prior to July 1, 1990.

As required by 26 C.F.R. § 31.3121(a)–1(h), CFS made a reasonable attempt to estimate what part of the amount CFS paid to the helpers was reimbursement for ordinary and necessary expenses incurred by the helpers. CFS' 40 percent allocation was based upon an analysis of the allocation both at CFS and at CFS' competitors.[7] Plaintiff,

---

**6.** In addition to the requirement that payments treated as reimbursed expenses be reasonable to qualify as excepted from "wages," 26 C.F.R. § 31.3121(a)–1(h) also requires that reimbursed expenses be identified by separate payment or otherwise. There is evidence that plaintiff identified reimbursed expenses paid to the helpers.

**7.** At trial, CFS' president conceded that CFS determined, sometime in 1992, that a 20 percent reimbursement figure more accurately estimated CFS' reimbursements to the helpers. Such a *post-hoc* determination is not—as defendant would have the Court find—determinative as to whether, at the time CFS estimated 40 percent as

therefore, satisfied the reasonableness requirement of 26 C.F.R. § 31.3121(a)–1(h) with respect to payments to helpers designated as reimbursed expenses for periods prior to July 1, 1990. Thus, plaintiff is not liable for failure to pay and withhold employment taxes on amounts paid to and received by helpers, and designated as reimbursed expenses, prior to July 1, 1990.

### 2. Payments After July 1, 1990

█ However, for payments by CFS to the helpers after July 1, 1990, CFS was required to substantiate, within a reasonable time from payment, expenses reimbursed to the helpers. See 26 C.F.R. §§ 31.3121(a)–1(h), 31.3121(a)–3. Unsubstantiated expenses reimbursed after July 1, 1990, respecting expenses paid or incurred on or after that date, are included in wages and are subject to withholding and payment of employment taxes. 26 C.F.R. § 31.3121(a)–3. CFS has not presented any proof to substantiate reimbursements to the helpers for any of the period from July 1, 1990 through 1992. All compensation paid by CFS and received by the helpers on or after July 1, 1990, respecting expenses paid or incurred after that date, therefore, is subject to withholding and payment of employment taxes.

Accordingly, the Court holds that CFS is entitled to claim that 40 percent of the compensation paid to the helpers on or before July 1, 1990 served as reimbursement of ordinary and necessary business expenses. CFS cannot, however, claim that any of the compensation paid and received by the helpers, respecting expenses paid or incurred after July 1, 1990 are reimbursements. In other words, for the time period in suit, CFS is liable for withholding and paying employment taxes on 100 percent of CFS' payments to the helpers, received by the helpers after July 1, 1990 for expenses paid or incurred after July 1, 1990. Further, CFS is liable for withholding and paying employment taxes on 60 percent of all payments on or before July 1, 1990 from CFS to the helpers.

---

reimbursement, CFS made a reasonable attempt to estimate the amount of reimbursement paid to the helpers prior to 1992. In fact, if relevant at all, CFS' later revision of its estimate to 20

### B. Negligence and Failure to Deposit Penalties

Defendant further claims that plaintiff is liable for negligence and failure to deposit penalties assessed with respect to the 40 percent of compensation paid to CFS' installers and their helpers as reimbursement of expenses. In light of the Court's finding that CFS' installers are independent contractors and that CFS is the statutory employer of the helpers, the Court addresses only defendant's claim with respect to the 40 percent CFS paid to the helpers, but upon which CFS did not pay or withhold employment taxes.

Defendant assessed CFS the negligence penalty pursuant to the former 26 U.S.C. § 6653, and the current 26 U.S.C. § 6662, of the Internal Revenue Code. With respect to the tax periods at issue in this action, § 6662 of the Internal Revenue Code governs returns with a due date after December 31, 1989, while § 6653 governs returns due prior to such date. See 26 U.S.C. § 461 note. Both § 6662, and the former § 6653, permit the Internal Revenue Service to assess the negligence penalty if a taxpayer "fail[s] to make a reasonable attempt to comply with the provisions" of the Internal Revenue Code as codified at title 26 of the United States Code.

Defendant further assessed a failure to deposit penalty pursuant to 26 U.S.C. § 6656 of the Internal Revenue Code. Section 6656(a) of the Internal Revenue Code provides in pertinent part that,

> [i]n the case of any failure by any person to deposit . . . on the date prescribed therefor any amount imposed by this title in such government depository as is authorized under section 6302(c) to receive such deposit, unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be imposed upon such person a penalty equal to the applica-

---

percent is evidence that CFS was conscious of making a reasonable attempt to estimate what percentage of the amount paid to the helpers was reimbursed expenses.

ble percentage of the amount of the under-payment.[8]

The applicable percentage referenced in § 6656(a) is defined by § 6656(b).

As the Court has indicated, an employer's reimbursement of expenses incurred by an employee do not constitute wages upon which the employer must withhold and pay employment taxes. *See* 26 U.S.C. § 3121(a); 26 C.F.R. § 31.3121(a)–1(h); *see also* 26 U.S.C. § 62. In the present action, CFS treated 40 percent of the payments to the installers' helpers as reimbursed expenses. Following drastic changes in the California state tax treatment of CFS in 1989, CFS made a reasonable attempt to comply with the provisions of the Internal Revenue Code by attempting to properly allocate between compensation and reimbursement for expenses. Additionally, for payments to the helpers prior to, and including, July 1, 1990, the Internal Revenue Code did not require that CFS substantiate the 40 percent allocation.[9] The Court, therefore, finds that CFS made a reasonable attempt to comply with the provisions of the Internal Revenue Code for payments by CFS to the helpers prior to, and including, July 1, 1990, and that any failure to withhold on amounts not properly treated as reimbursed expenses was not willful. Accordingly, the Court holds that neither the negligence penalty, nor the failure to deposit penalty, may be imposed for employment taxes neither paid, nor withheld, prior to, and including, July 1, 1990.

With regard to CFS' payments to helpers after July 1, 1990, the Court finds that 26 C.F.R. § 31.3121(a)–1(h) gave CFS clear notice that CFS would be required to substantiate any payments to the helpers that CFS would seek to treat as reimbursed expenses. CFS failed to provide evidence at trial substantiating payments to helpers, which payments were treated as reimbursed expenses for tax purposes. The Court, therefore, finds that CFS did not have reasonable cause, and was negligent, in not paying and withholding employment taxes on wages paid to the helpers after July 1, 1990. Accordingly, the Court holds that CFS is liable for negligence and failure to deposit penalties assessed by the Internal Revenue Service respecting payments to the helpers after July 1, 1990.

### *CONCLUSION*

For the foregoing reasons, the Court holds that CFS' installers were independent contractors, and not CFS' employees, during the years 1989 through 1992. The Court also holds that CFS was the statutory employer of the installers' helpers during the years 1989 through 1992. The parties shall submit a stipulation regarding damages to the Court by September 30, 1997.

---

**8.** The current version of 26 U.S.C. § 6656(a), as excerpted above, applies to taxable years beginning after December 31, 1989. *See* 26 U.S.C. § 6656 note. The predecessor version of § 6656 is substantially similar, but mandates a ten percent penalty on the amount of the underpayment. *See* 26 U.S.C. § 6656(a). As indicated above, the current version of § 6656 provides for the applicable penalty in § 6656(b).

**9.** As indicated previously, CFS' reduction to 20 percent the amount treated as reimbursed expenses came only with the benefit of hindsight. During the time period in suit prior to July 1, 1990, CFS' designation of 40 percent of the amount paid to the helpers as reimbursed expenses was a good faith effort to comply with federal requirements while attempting to adjust to newly imposed California state tax requirements.