[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-10997

_____

D.C. Docket No. 8:16-cv-01873-MSS-AEP

TRINET GROUP, INC.,

Plaintiff – Appellee,

versus

UNITED STATES OF AMERICA,

Defendant – Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(November 5, 2020)

Before JORDAN, TJOFLAT, Circuit Judges, and BEAVERSTOCK,* District Judge.

TJOFLAT, Circuit Judge:

This appeal arises out of a dispute between TriNet and the IRS regarding an alleged overpayment of federal income tax in the amount of $10,567,468. TriNet initiated this action as the successor-in-interest of Gevity HR, Inc., a professional employer organization ("PEO"). From 2004 to 2009, Gevity claimed tax credits based on its payment of Federal Insurance Contributions Act ("FICA") taxes on the tip income of its client companies' employees. The IRS asserts that such credits were not allowed because Gevity was not the "employer" entitled to claim the credits as that term is defined in 26 U.S.C. § 3401(d). We conclude that, under the statutes applicable to the period at issue,[1] Gevity was the statutory employer

---

* The Honorable Jeffrey U. Beaverstock, United States District Judge for the Southern District of Alabama, sitting by designation.

[1] In 2014, Congress added §§ 3511 and 7705 to the Internal Revenue Code, specifying that, for the purpose of employment taxes, "a certified [PEO] shall be treated as the employer (and no other person shall be treated as the employer) of any work site employee performing services for any customer of such organization." 26 U.S.C. § 3511(a)(1). Certain tax credits, including the FICA tip credit, apply only "to the customer, not the certified [PEO]." *Id.* § 3511(d). Such entities must be certified by the Secretary of the Treasury. *Id.* § 7705(a).

The District Court determined that these statutes are "new pronouncements of law that became effective on December 19, 2014" and do not apply retroactively. On appeal, the IRS admits that these provisions do not apply to its dispute with TriNet, and we do not consider them in our analysis.

2

entitled to claim the FICA tip credit because it—not its client companies—controlled the payment of the wages subject to withholding.  We affirm the District Court's grant of summary judgment in favor of TriNet.

I.

Employers are required to withhold FICA (Social Security and Medicare) taxes from their employees' wages and remit the taxes to the IRS.  26 U.S.C. §§ 3101, 3102(a).  Employers are also required to pay an employer's share of FICA taxes based on the wages that are paid to their employees.  *Id.* § 3111.  Tips received by an employee are included in the wages subject to tax.  *Id.* § 3121(q).

Under 26 U.S.C. § 45B, an employer can claim an income tax credit for its share of FICA taxes on excess tips received by its employees "in connection with the providing, delivering, or serving of food or beverages for consumption if the tipping of employees delivering or serving food or beverages by customers is customary."  The credit is equal to the amount of FICA tax "paid by [the] employer" on the portion of tips exceeding the amount treated as wages for the purpose of satisfying federal minimal wage requirements.  *Id.* § 45B(b)(1).[2]

---

[2] The Fair Labor Standards Act allows an employer to pay less than the minimum wage directly to a tipped employee by treating tips as part of the employee's wages.  29 U.S.C. §§ 203(m)(2), 206(a).

Although the term "employer" is not specifically defined in the FICA tax provisions of the Internal Revenue Code, the Supreme Court has given it the same construction for FICA purposes as the definition used for income tax withholding. *See Otte v. United States*, 419 U.S. 43, 51, 95 S. Ct. 247, 253 (1974). That definition is found in 26 U.S.C. § 3401(d), which provides:

> [T]he term 'employer' means the person for whom an individual performs or performed any service, of whatever nature, as the employee of such person, except that—
>
> (1) if the person for whom the individual performs or performed the services does not have control of the payment of the wages for such services, the term "employer" (except for purposes of subsection (a))[3] means the person having control of the payment of such wages, and
>
> (2) in the case of a person paying wages on behalf of a nonresident alien individual, foreign partnership, or foreign corporation, not engaged in trade or business within the United States, the term "employer" (except for purposes of subsection (a)) means such person.

As is standard, we refer to the "person for whom an individual performs or performed any service" as the common-law employer and the "person having control of the payment of such wages," in the case described by paragraph (d)(1), as the statutory employer. The parties in this case agree that Gevity was not the entity for whom its clients' employees performed services and, therefore, was not the common-law employer. They disagree on whether Gevity was nonetheless the

---

[3] Subsection (a) defines "wages" and lists numerous exceptions for remuneration paid for certain services.

statutory employer.

## II.

The parties cross-moved for summary judgment before the District Court. Except where otherwise noted, the following facts were stipulated to by the parties or are conceded by the IRS.

## A.

TriNet is a PEO that acquired Gevity HR, Inc. in 2009. Gevity provided various employment and human resource services to its clients, including payroll processing, employment tax services, health and welfare benefits, and workers' compensation coverage. Gevity's clients included restaurants and other food and beverage clients where tipping is customary.

Gevity entered into a standardized contract, known as a professional services agreement ("PSA"), at the start of each relationship with a client. The PSAs provided that Gevity would assume responsibility for, among other things:

    a. "Processing and issuing employee paychecks in accordance with [the client's] instructions"; and

    b. "Managing the paperwork, including [the client's] payroll and payroll processing, tax filing and administration, [and] W-2 preparation."

On the other hand, Gevity's clients were allocated responsibility for:

    a. "Compensating employees for their work, providing benefits, and

5

determining paid time-off policies";

b. "Hiring and termination decisions";

c. "Managing and supervising the day-to-day work of employees; providing training and development opportunities; and providing performance appraisals and appropriate salary adjustments";

d. "Delivering rewards and incentives";

e. "Informing employees of their benefit options"; and

f. "Running [the] business and making business decisions."

Under the PSAs, Gevity and its clients were deemed co-employers of its clients' employees, who were referred to as "worksite employees." In particular, the agreements stated that "[t]he Client shall at all times retain its status as an employer of [the worksite employees] but the entirety of an employer's rights and responsibilities shall be shared and allocated between Gevity and the Client as set forth in this Agreement, so that [the worksite employees] shall be simultaneously employed by both parties."

The PSAs required clients to pay Gevity (i) the gross wages of the worksite employees, including employment taxes; (ii) Gevity's service fee; (iii) employer contributions to any benefit plans; and (iv) fees for any other services not covered by the service fee. Gevity was to provide its clients with invoices for the amounts due each pay period, and the invoices were payable immediately upon receipt. The PSAs specified that payment to Gevity must be made through "wire transfer, Automated Clearing House ('ACH') transfer, or other method acceptable to Gevity."

6

Gevity's obligation to process and issue paychecks in accordance with its clients' instructions was typically set forth in a separate schedule attached to the PSA. The PSAs provided that Gevity would be responsible for "the reporting, collection and payment of federal and state [employment] taxes on wages paid" to worksite employees and would pay all related costs. In addition, some but not all of the PSAs stated that Gevity "assumes . . . responsibility for the payment of wages to [the worksite employees] without regard to payments by Client to Gevity."

### B.

Gevity's payroll process was structured in the following manner. The worksite employees earned wages at least a week before the pay date when they received wage payments from Gevity. The client was required to report to Gevity the number of hours worked by each worksite employee, whether any new hires or terminations occurred, any changes in the rate of pay for each employee, and any tips received by an employee. Clients generally reported this information the next business day following the closure of a pay period, which was two or three days before the pay date. Gevity then calculated the payroll, including employment tax amounts, and generated an invoice for the client.

On the pay date, Gevity paid the net wages of each worksite employee

7

through direct deposit using a debit against Gevity's own bank accounts or through a paper check drawn on its own accounts. The clients had no access to or authority over any of Gevity's bank accounts. Finally, Gevity remitted employment taxes to the IRS for the wages paid to the worksite employees.

There was an "inherent lag" in the payroll process for most client payments between the time when Gevity invoiced the client and the time when Gevity received permanent credit for the client's payment. Approximately seventy-five percent of client companies paid using ACH transfer. In these transactions, Gevity initiated a debit from the client's account for the full payroll amount, including taxes and fees, two days before the pay date. Within one day of this debit, Gevity received a "provisional credit" for the payment in its account; however, the credit could be reversed at any time within five business days if the client had insufficient funds or for certain other reasons, as when the client placed a "stop payment" order on the transaction or when the client's account was frozen. Gevity did not receive notice when an ACH debit cleared. But if an ACH debit did not clear, Gevity would learn of this fact within three to five business days through a report that it requested from its bank showing deposits that were returned for insufficient funds and other reasons. Consequently, Gevity would not know whether the client's ACH transfer had cleared until at least one day after making the wage payments to the worksite employees. Payments from clients made by company check similarly

8

took three to five days to clear. On the other hand, funds paid through wire transfer or certified check became immediately available without a delay for the transaction to clear.

If a client failed to pay Gevity's invoice when due, it appears that the PSAs provided for a late fee of up to 1.5% of the outstanding amount per month.[4] The PSAs also appear to have stated that "[u]nder no circumstances shall any amounts advanced by Gevity to [worksite employees] or third parties, and which are not paid by the Client on a timely basis, be deemed a loan to the Client."

C.

Gevity reported federal employment tax information to the IRS by filing Forms 941, Employer's Federal Quarterly Tax Returns. On these forms, Gevity reported (i) the number of employees, including both worksite employees and its own non-worksite employees, that received compensation from Gevity; (ii) the amount of compensation, including wages, tips, and other compensation; (iii) the federal income tax withheld from that compensation; (iv) FICA taxes due on that compensation; and (v) the total tax due for the tax quarter. The Forms 941 were filed under Gevity's own name, address, and Employer Identification Number

---

[4] The PSA provisions mentioned in this sentence and the following are identical in the two sample PSAs included in the appendix, which both parties cite to establish the content of the agreements.

("EIN"). Gevity's deposits of employment taxes to the IRS were also made under its own name and EIN. Furthermore, the schedule to the PSAs appears to have specified to Gevity's clients that Gevity would file tax returns "under Gevity's FEIN."[5]

When filing its Forms 941, Gevity did not state, and was not required to state, that it was operating as a PEO. The IRS processed Gevity's Forms 941 without determining the accuracy of the information reported on the forms or making a determination as to whether Gevity was a common-law or statutory employer.

Between 2004 and 2009, when Gevity filed its corporate income tax returns, it attached certain forms, including Forms 8846, Credit for Employer Social Security and Medicare Taxes Paid on Certain Employee Tips, in order to claim the FICA tip credit. Gevity claimed the FICA tip credit with respect to worksite employees at 274 to 477 client companies per year, totaling more than 1,170 clients over the period at issue. Gevity provided a rebate of the FICA tip credits to some of its larger clients; from the figure indicated by the appellee, the rebates accounted for about half of the total credit amount claimed by Gevity.

Eventually, during an examination of Gevity's corporate income tax returns,

---

[5] This language occurs in both of the sample PSAs. *See supra* note 4.

the IRS determined that Gevity was not eligible for the FICA tip credits on the ground that it was neither the common-law employer nor the statutory employer of the worksite employees. The IRS then issued notices of deficiency for the 2004 through 2009 tax years, which the appellee paid in full. After the IRS denied claims for refund of these amounts, TriNet sued in federal court as Gevity's successor, seeking a refund of $10,567,468, plus interest.

## D.

The District Court granted TriNet's motion for summary judgment and held that Gevity was the statutory employer under § 3401(d). It relied on the Middle District of Florida's analysis in *Paychex Business Solutions, LLC v. United States*, No. 8:15-cv-1455-T24-TGW, 2017 WL 2692843 (M.D. Fla. June 22, 2017), which, as the District Court explained, involved "nearly identical circumstances to the case at hand."

In *Paychex*, the plaintiff, a PEO, "had assumed full responsibility for the reporting, collection, and payment of payroll taxes with respect to" its clients' employees. *Paychex*, 2017 WL 2692843, at *3. Paychex had erroneously overpaid the employer's portion of the Social Security tax due to mistakenly restarting the taxable wage base and was suing for a refund from the IRS. *Id.* The court held that Paychex was the statutory employer. *Id.* at *4. Looking to a

11

number of prior decisions, the court concluded that the "trend in the case law shows that the person or entity that controls the bank account from which wages are paid is the § 3401(d)(1) statutory employer." *Id.* at \*4; *see, e.g.*, *Winstead v. United States*, 109 F.3d 989, 991-92 (4th Cir. 1997); *Consol. Flooring Servs. v. United States*, 38 Fed. Cl. 450, 459 (1997); *United States v. Total Employment Co.*, 305 B.R. 333, 339 (M.D. Fla. 2004).  Accordingly, because Paychex had exclusive control of the bank accounts from which the clients' employees were paid, the court found that Paychex had control of the payment of wages. *Paychex*, 2017 WL 2692843, at \*7.  The court also rejected the IRS's argument that Paychex was merely a conduit between the employer and the employee, noting that Paychex could not confirm the sufficiency of its clients' funds prior to paying the employees.  *Id.*

The District Court concluded that *Paychex* was not wrongly decided. Among other things, the Court addressed the IRS's argument that it should rely on two earlier cases, *United States v. Garami*, 184 B.R. 834, 838 (M.D. Fla. 1995), and *In re Professional Security Services*, 162 B.R. 901, 904 (Bankr. M.D. Fla. 1993), which had each held a common-law employer liable for unpaid employment taxes despite the existence of a contractual arrangement under which a third-party payor agreed to pay such taxes. In particular, the *Professional Security* decision stated:

12

> The law is clear that the person assessed cannot establish that he is not the person responsible merely by showing that he delegated the taxing responsibility to someone else, for the holding of employees' taxes is considered an important fiduciary duty that cannot be delegated. The existence of other responsible parties who also control disbursement and have the requisite status, duty, and authority does not relieve the party assessed of his own responsibility.

162 B.R. at 904.  According to the IRS, these two cases supported the proposition that when the third party receives payment from the common-law employer prior to or contemporaneously with the payment of wages, the third party is not a statutory employer.  The District Court rejected this contention, taking the position that *Garami* and *Professional Security* "found only that the common law employer remains liable when it contracts with a third party to pay employment taxes" and "did not find that a third party was not also liable if it were deemed to be the § 3401(d)(1) employer."  Finding no merit to the IRS's objections, the District Court followed *Paychex* to conclude that Gevity was the statutory employer.

### E.

The IRS now appeals.  It argues that Gevity's clients had control of the payment of wages to the worksite employees because they provided the funds that Gevity used to pay the wages and provided the information needed to determine the payroll.  Gevity, it contends, was simply a conduit for its clients' funds, paying the worksite employees only because its clients directed it to do so.  The IRS asserts that the special definition of "employer" in § 3401(d)(1) is a limited

13

exception that was "designed solely to meet special and unusual situations," such as the payment of pensions by certain pension trusts, *see* 26 C.F.R. § 31.3401(d)-1(f), (h), and should therefore be given a "narrow construction," *see Century Indem. Co. v. Riddell*, 317 F.2d 681, 691 (9th Cir. 1963).  In addition, the IRS argues that in interpreting *Garami* and *Professional Security*, the District Court endorsed an erroneous co-employer theory of § 3401(d) under which a common-law employer and an asserted statutory employer could both count as an "employer" under the statute, even though the plain language of the section allows for only one of these to be the "employer."

## III.

We affirm the District Court's order.  Gevity is entitled to claim the FICA tax credits as the statutory employer because it, not its client companies, had "control of the payment of such wages."  In reaching this result, however, we do not follow exactly the same reasoning advanced by the District Court and by TriNet.

## A.

We begin with an important preliminary clarification. It should be observed that the person who is entitled to claim the FICA tip credit must be the same person who is responsible for withholding FICA taxes from wage payments.  The

14

statute clearly specifies that "employer" means one of two persons: *either* (1) it is "the person for whom an individual performs or performed any service" (the common-law employer), *or*, (2) if that person "does not have control of the payment of the wages for such services," then the "employer" is "the person having control of the payment of such wages" (the statutory employer).  26 U.S.C. § 3401(d).  These options are mutually exclusive.  If the common-law employer controls the payment of wages, then the common-law employer is the "employer" under the statute; if the common-law employer does not control the payment of wages, then the person who does have such control is the "employer." Consequently, as between the common-law employer and a party who is not a common-law employer but purports to be the statutory employer on the basis of having control of the payment of wages, only one of them can be the "employer" under the statute.[6]  That one "employer" is then expressly both liable for withholding and paying FICA taxes, *id.* §§ 3102(a)-(b), 3111, and entitled to claim the FICA tip credit, *id.* § 45B.  After all, the credit is a credit for having "paid or incurred" the FICA tax.  *Id.* § 45B(a).  A person who is not the "employer" under § 3401(d), contrariwise, is neither responsible for paying the taxes nor eligible for the credit.

---

[6] In other words, if the common-law employer qualifies as the "employer" under the statute, there can be no such thing as a distinct 'statutory employer'. Using this terminology in such circumstances only creates confusion.

15

B.

On the main issue of how to apply the statutory criterion of control, TriNet's basic position is that if a person other than the common-law employer has exclusive control over the bank account from which wages are paid, then that person has control of the payment of wages and necessarily qualifies as the statutory employer. This bank-account-control interpretation has been accepted by a number of courts and represented the principal, though not exclusive, line of reasoning taken by the District Court. *See Paychex*, 2017 WL 2692843, at *4, *7; *Winstead*, 109 F.3d at 991-92; *Consol. Flooring*, 38 Fed. Cl. at 459; *Total Employment*, 305 B.R. at 339. However, we are not prepared to say that control of the bank account used to make payments should always be determinative. The statute speaks in terms of "control of the payment of wages," not control of bank accounts, and control of the payment of wages does not seem to be purely a matter of which person is last in possession of the funds being paid. The notion of control includes not only physical possession of a thing or physical execution of an action affecting it, such as the transferring of money, but also the authority or responsibility for taking such an action. *See Control, n.*, *Black's Law Dictionary* (11th ed. 2019) ("The direct *or indirect* power to govern the management and policies of a person or entity . . . ; the power or authority to manage, direct, or oversee" (emphasis added)); *see also Searock v. Stripling*, 736 F.2d 650, 653 (11th

16

Cir. 1984) (noting, in the context of document production, that "[c]ontrol is defined not only as possession, but as the legal right to obtain the documents requested upon demand").

Accordingly, in some cases it is possible that the person whose bank account is used to make the payment may not be best understood as the one controlling the payment, or even the one genuinely paying the employee. Suppose, for instance, that a store owner whose account is low because he has forgotten to deposit the cash received for that week needs to pay his workers after the bank has closed. He gives a friend the amount of the pay in cash and asks the friend to write checks to each of the employees from her own account. It does not seem likely that the friend in this scenario, by doing a one-time favor for the store owner, thereby becomes the person in control of the payment of wages. The friend has already been given the money in advance and bears no risk of default from the store owner. The friend might not have any idea about what employment taxes are to be paid; indeed, she would not even need to know the specific purpose of the payments—perhaps some might be for employees and some for vendors. In such a scenario it would appear that the friend is a mere conduit, whereas the owner is the person really paying the employees and thus must be the one controlling the payments. This example illustrates how control depends on who is actually responsible for the payment of wages, as informed by the parties' understandings of their

17

arrangement.

C.

The proper approach to the inquiry recognizes that control of the payment of wages is something that the parties can allocate between themselves through their agreement. Because both liability for employment taxes and entitlement to credits follow control, the parties' understanding of who will bear the responsibility for tax withholding or who will be able to claim tax credits is strong evidence of who has control of the payments. The allocation of such liability and entitlement may be either implicitly or explicitly part of the bargain between the parties. Important aspects of the parties' understanding of their bargain may be revealed by how the parties carry out the agreement in practice. Restatement (Second) of Contracts, § 202(4) (Am. Law Inst. 1981) ("Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement."); *see Alabama v. North Carolina*, 560 U.S. 330, 346, 130 S. Ct. 2295, 2309 (2010) (course of performance may be "highly relevant").

This observation does not mean that the employer under § 3401(d) can

18

"relieve[] itself of the obligation to pay employment taxes by delegating that function" by contract. *Prof'l Sec.*, 162 B.R. at 904; *see Garami*, 184 B.R. at 838. A person cannot delegate the tax responsibility to another party as long as the person remains the "employer" according to the statute. But the statute places the duty to withhold and pay taxes on the person who controls the payment of wages. If the common-law employer does not have such control, the tax liability falls by law on the party with control, without needing to be delegated. The parties' contract can certainly affect who has control of the payments, and hence the contractual arrangement must be taken into account in determining who is the employer under the statute.

D.

In this case, it was part of the bargain between Gevity and its clients that Gevity would control the payment of wages and would be responsible for the withholding of taxes. This conclusion follows from a consideration of the totality of the parties' agreement as it functioned in practice, most importantly the fact that Gevity generally issued wage payments before receiving cleared payment from its clients.

Gevity's PSAs committed payroll and tax reporting matters to Gevity rather than to its clients. The agreements made Gevity responsible for "payroll and

19

payroll processing, tax filing and administration, [and] W-2 preparation." Gevity computed pay and withholding amounts, remitted taxes to the IRS, and issued checks for net pay to worksite employees. Moreover, the PSAs provided that "the entirety of an employer's rights and responsibilities shall be shared and allocated" between Gevity and its clients and purported to render the worksite employees "simultaneously employed by both parties." While, as explained above, Gevity and its clients could not both qualify as the "employer" under § 3401(d), the fact that the agreements envisioned a co-employment relationship is relevant. It supports the idea that the parties conceived of Gevity as having a responsibility of its own to pay the employees' wages and not just acting as a conduit for its clients' funds.

The PSAs also specifically stated that Gevity would be responsible for "the reporting, collection and payment of federal and state [employment] taxes on wages paid" to worksite employees and would pay all related costs. Gevity reported tax withholdings on its own tax forms under its own name and EIN, and the PSAs appear to have made it explicit that "Gevity's FEIN" would be used. These considerations suggest that the parties would have understood Gevity to be liable to the government for employment taxes. That understanding also carries a suggestion, in turn, that Gevity would be entitled to any tax credits associated with those taxes, absent other contractual provisions to the contrary. This is the case

20

even though we have not been directed to any provision in the PSAs expressly giving Gevity the right to claim such tax credits.[7]

Some of the PSAs provided that Gevity assumed responsibility for paying wages "without regard to payments" by its clients.  Not all of the PSAs included this language, and the IRS disputes whether the ones that did actually obligated Gevity to issue paychecks if a client failed to make payment of the wage amounts, arguing that the agreements gave Gevity the right to remove employees from its payroll when a client notified Gevity that it would not be able to pay.  The parties' dealings as they implemented their arrangement, however, establish that Gevity in practice placed its own funds at risk in making wage payments.  For the roughly three-fourths of clients that paid using ACH debit, Gevity systematically issued payroll to worksite employees at least a day before funds for the payroll were fully cleared by the client's bank, and thus made wage payments even when the client ultimately would not be able to pay.  The parties' practice in this regard is crucial in demonstrating that the bargain between the parties afforded Gevity

---

[7] The record includes a PSA addendum for one client with a provision indicating that, at the client's request, Gevity would provide "reimbursement" of the FICA tip credit.  However, Gevity's practice of refunding tip credits to some clients does not affect our larger conclusion that Gevity's PSAs made Gevity responsible for tax withholding and provided it with control of the payment of wages.  The major consideration in the above discussion is responsibility for taxes, which the PSAs clearly place on Gevity.

21

actual control of the payment of wages.

The IRS maintains that client defaults were rare and that as a matter of economic reality the payroll funds were provided by the clients, who were contractually responsible for "[c]ompensating employees for their work." Thus, it contends, client funds in substance simply flowed through Gevity, leaving the real control with the clients. This argument is not sustained by the facts of the case. The IRS is basically asserting that Gevity acted as a bank, providing financing for payments that its clients instructed it to advance to worksite employees. Yet a bank would have preferred to receive guaranteed payment from its clients first, and it would have charged interest on any money being disbursed on its clients' behalf whenever it could not confirm the receipt of funds by the payroll date; it would not have accepted the risk of default without compensation. Gevity, by contrast, gave its clients the option to use a payment method, ACH debit, for which payments could not be confirmed until after Gevity was scheduled to send payroll and for which Gevity was not even notified of the exact date when payments cleared. While Gevity charged late fees for past-due invoices, it did not charge and indeed could not have calculated interest for the number of days for which payroll funds would have effectively been on loan to clients whose payments eventually cleared. Its PSAs appear to have specifically sought to ensure that unpaid amounts advanced to worksite employees would not "be deemed a loan" to the client. More

22

generally, Gevity was clearly not in the business of finance for its clients but instead in the business of managing payroll.  Given these facts, it did not function as a mere conduit.[8]

For the above reasons, we conclude that Gevity, rather than its clients, had "control of the payment of wages" to worksite employees. As a result, Gevity was the statutory employer under § 3401(d), and summary judgment was properly granted.

**AFFIRMED.**

---

[8] Because we find that Gevity qualifies squarely as having control of the payment of wages, we need not further address the IRS's argument that § 3401(d)(1) should be given a narrow construction.

JORDAN, Circuit Judge, concurring:

The U.S. Tax Code has been called a lot of things, but I doubt that anyone has characterized it as a font of equity. I join the Court's opinion not only because its construction of 26 U.S.C. § 3401(d) seems correct to me, but also because the result here approaches "rough justice" in tax terms. As the Court points out, only one entity—the common law employer or the statutory employer—is responsible for withholding FICA taxes and can then claim the FICA tax credits. As a result, there is little danger that the IRS will be subject to competing and inconsistent claims for FICA tax credits.