**UNITED STATES of America,**
**Appellant,**

v.

**TOTAL EMPLOYMENT COMPANY,**
**INC., Appellee.**

**No. 8:03–CV–1921–T–30MAP.**

United States District Court,
M.D. Florida,
Tampa Division.

Feb. 12, 2004.

Carol Koehler Ide, U.S. Dept. of Justice, Tax Division, Washington, DC, for USA, appellant.

Herbert Roy Donica, Herbert R. Donica, P.A., Caryl E. Delano, Addison & Delano, P.A., Tampa, FL, for Total Employment Company, Inc. dba TEC, appellee.

## ORDER

MOODY, District Judge.

This is an appeal from the United States Bankruptcy Court of an Order sustaining in part and overruling in part Debtor's objections to Claim # 7 of the Internal Revenue Service (the "IRS") as amended by Claims # 21 and # 27.[1] This Court has jurisdiction pursuant to 28 U.S.C. § 158(a). The Court has read the briefs of the parties and heard oral argument. The main

issue for this Court to resolve is whether an employee leasing company is considered an "employer" for payroll tax purposes. The Bankruptcy Court found that an employee leasing company does not have "control of the payment of wages" and is therefore not responsible to the IRS for payroll taxes.

This Court reviews the Bankruptcy Court's conclusions of law *de novo* and its findings of fact under a clearly erroneous standard. Because this Court determines that the employee leasing company at issue in this case was the statutory employer in "control of the payment of wages," the Order of the Bankruptcy Court is REVERSED and the case is REMANDED to the Bankruptcy Court for further proceedings not inconsistent with this opinion.

## BACKGROUND

Total Employment Company, Inc. ("TEC") is an "employee leasing company" as defined by Florida Statutes § 468.520. TEC filed a petition for relief under Chapter 11 of the Bankruptcy Code on September 13, 2002. The IRS filed a proof of claim and amended proof of claims for unpaid federal employment taxes for employees leased by TEC to four (4) "client companies."[2] TEC objected to the IRS's claim.

The claim as to the four client companies involves the same issue of law and similar facts. The largest portion of the claim, by far, relates to the subsidiaries of American Enterprise Solutions, Inc. (collectively "AESI"). The parties stipulated to the facts concerning the AESI claim

---

1. The Government filed a motion to consolidate this appeal with an appeal in case number 8:03–cv–2122–T–30TGW. This Court grants the Government's motion and consolidates the appeals.

2. A "client company" is defined by Florida Statutes § 468.520(6) as "a person or entity which contracts with an employee leasing company and is provided employees pursuant to that contract."

and agreed that the ruling of the Court would apply to all four client companies.

Employee leasing companies gained much of their economic attractiveness because of the mushrooming cost of health, disability, and workers' compensation insurance. Small companies were unable to obtain volume discounts given to larger groups. Employee leasing companies provided the vehicle by which these smaller companies could pool their employees and obtain the volume discounts. But, to qualify for these group plans, the individual persons to be insured had to become the employees of the employee leasing company and then be "leased back" to their former companies, now the clients of the employee leasing company.

To facilitate this arrangement, the State of Florida enacted statutory requirements.[3] It created a Board of Employee Leasing Companies (the "Board") within the Department of Business and Professional Regulation. In Florida, no person or entity may practice or hold itself out as an employee leasing company unless such person or entity is licensed pursuant to statute.[4]

This statutory framework makes possible the economic advantages earlier described, but also places certain burdens upon the employee leasing companies. These burdens include, but are not limited to, maintaining a license, having an initial net worth of at least $50,000, having a certain net worth and positive working capital, submitting audited financial statements annually to the Board, maintaining records for a minimum of three calendar years, and requiring all client agreements to be in writing. *See* Fla. Stat. § 468.525.

Pertinent to the issue before this Court, Florida Statutes § 468.525(4)(b) and (c) re-
quires the employee leasing contract to contain a provision that:

> (b) assumes responsibility for the payment of wages to the leased employees without regard to payments by the client to the leasing company.

> (c) assumes full responsibility for the payment of payroll taxes and collection of taxes from payroll on leased employees.

And, an employee leasing company is responsible for the payment of unemployment taxes and workers' compensation coverage pursuant to Chapter 440 and 443 of the Florida Statutes. *See* Fla. Stat. § 468.529(1).

### FACTS

Consistent with these statutory requirements, TEC entered into written contracts with AESI in 1999 including the following provisions at Section II., C.:

> TEC shall have sufficient authority so as to maintain a right of direction and control over leased employees to Subscriber's location, and shall retain authority to hire, terminate, discipline and reassign leased employees. Subscriber shall, however, retain such sufficient direction and control over the leased employees as is necessary to conduct Subscriber's business and without which Subscriber would be unable to conduct its business, discharge any fiduciary responsibility that it may have, or comply with any applicable licensure, regulatory, or statutory requirement of Subscriber. Additionally, TEC assumes responsibility for the payment of wages to the leased employees without regard to payments by Subscriber to TEC and TEC assumes full responsibility for the payment of payroll taxes and collection

---

**3.** Fla. Stat. § 468.520, *et seq.*

**4.** Fla. Stat. § 468.531(1)(a).

of taxes from payroll on leased employees.

At Section V., A., the contract provides:

All funds due TEC are payable prior to TEC's issuance of payroll checks each pay period.

At Section X., A., the contract provides:

If for any reason payment is not made when due, Subscriber agrees that TEC will have the right to terminate its performance hereunder, withhold its employees services, and/or bring suit seeking damages. Upon termination of this Agreement, for any reason, or should Subscriber fail to timely pay TEC for its services, all of the employees shall be deemed to have been laid off by TEC and immediate notification of this shall be provided by Subscriber to employees who had been leased pursuant to this Agreement. Subscriber shall immediately assume all federal, state and local obligations of any employer to the employees which are not in conflict with state or federal law, and shall immediately assume full responsibility for providing workers' compensation coverage. TEC shall immediately be released from such obligations as are permitted by law. It is the intent of the parties that, where allowed by law, they be placed in their respective positions immediately before their entry into this Agreement in the event of a termination or Subscriber's failure to pay TEC. If for any reason (whether or not required by applicable law) TEC makes any payments to any of the employees after this Agreement has been terminated, TEC shall be entitled to full reimbursement for such expenditures.

During 1999, AESI fell behind in its payments to TEC and TEC, contrary to its usual business practice, advanced payroll on behalf of AESI. In January 2000, AESI paid TEC sufficient funds to remedy its 1999 tax delinquencies but, once again, had insufficient funds to meet its January payrolls. TEC paid the AESI payrolls for approximately two weeks out of its own funds without requiring payment in advance by AESI. For those two weeks, TEC funded AESI's net payroll, but failed to pay federal employment taxes.

Thereafter, TEC insisted upon receiving payment for net payroll and certain benefits from AESI prior to issuing payroll checks. TEC neither required AESI to remit taxes nor pay the payroll taxes itself.

On March 21, 2000, TEC sent a letter to AESI advising of TEC'S intent to discontinue service of the AESI accounts and confirming that, because of a lack of payment, as directed by AESI, TEC was not remitting taxes for AESI workers. The letter stated:

As you are aware we have not been remitting the taxes for AESI and their employees, at your direction, for lack of payment by AESI to us in order to remit such payments to the appropriate taxing authorities on AESI's behalf.

. . .

As I had discussed with you prior to this letter it is our intent to exercise our contractual rights and place you back into our respective positions for all liabilities prior to our entering into our agreements. We will be amending any filings necessary to effectuate our rights and all such liabilities, including taxes, will be your responsibility as you have previously acknowledged.

On April 25, 2000, TEC sent a second letter enclosing an addendum to the contract again stating that, due to the lack of payment, TEC was not remitting taxes for AESI workers. It stated:

Again, I want to reiterate that we are not remitting taxes to the appropriate taxing authorities on behalf of AESI or

its employees as a result of non payment of funds to do so. This is being done at your direction and you are fully aware of your responsibility for these taxes and any penalties or interest related to them.

On April 26, 2000, AESI executed the addendum which provides:

> As a result of the agreement previously entered into between TEC and AESI for professional employer services, and in consideration for the continued extension of credit to AESI by TEC in regards to payment for services rendered, AESI agrees to reimburse TEC for all payroll tax penalties arising from TEC not being able to meet its [AESI's] tax payment requirements.

TEC continued to pay the net payroll on the employees it leased to AESI until the contract was terminated in November 2000. During that time, TEC continued to hold itself out as the employee leasing company for the employees it leased to AESI and provided health, disability, and workers' compensation benefits as the employer of those employees.

TEC timely filed forms 941 (quarterly employment tax returns) with the IRS for the first, second, and third quarters of 2000, which set forth the total wages paid by TEC to the employees it leased to AESI. Although TEC reported withheld income taxes and social security (FICA) taxes (both withheld and the employer contribution) for all three quarters, it made several late payments and failed to deposit over $1,900,000 for the second and third quarters. As a result of the underpayments, the IRS is claiming penalties and interest in addition to the deficiency.

After the IRS began efforts to collect TEC's reported tax liabilities, TEC sought to amend its filed returns to exclude from the reported gross wages those wages pertaining to AESI and the other three clients in like position. TEC claimed that it was entitled to a refund of overpaid taxes for the first, second and third quarters of 2000 in excess of $1,500,000. Because the amended returns were filed after the IRS began its collection efforts, the IRS did not accept the amended returns for filing.

## DISCUSSION

The central issue between the parties is whether an employee leasing company is an "employer" of the leased employees as defined by 26 U.S.C. § 3401(d). An affirmative answer resolves all issues between the parties in the case at bar including in the cross-appeal.

Section 3402(a) requires every employer making payment of wages to withhold income taxes. Section 3401(d)(1) defines an "employer:"

> For purposes of this chapter, the term "employer" means the person for whom an individual performs or performed any service, of whatever nature, as the employee of such person, except that—
>
> (1) if the person for whom the individual performs or performed the services does not have control of the payment of the wages for such services, the term "employer" . . . means the person having control of the payment of such wages.

Disputes involving this section most often involve employee versus independent contractor situations. The IRS has developed a twenty-factor test to determine whether an individual is an employee or an independent contractor.[5] These factors have been developed by courts over the years and are called the "common law" factors for the determination of whether an individual is an employee.

---

5. Revenue ruling 87–41, 1987–1 C.B. 296.

■ It is unnecessary for the Court to discuss the twenty factor test in this case because the parties have stipulated that AESI, the client company, is the common law employer of the leased employees. The common law employer has a non-delegateable duty to timely perform its federal income tax obligations and cannot avoid its tax liability by contracting away the responsibility for the payment of wages. *See United States v. Garami,* 184 B.R. 834 (M.D.Fla.1995); *In re Professional Security Services, Inc.,* 162 B.R. 901 (Bankr.M.D.Fla.1993).

The question before this Court is whether an employee leasing company (here TEC) is also an "employer" of the employees it leases to its clients. Because it is not the common law employer, an employee leasing company can only be determined to be an "employer" under 26 U.S.C. § 3401(d) if it was in control of the payment of wages. This issue has been addressed in *In re Earthmovers, Inc.,* 199 B.R. 62 (Bankr.M.D.Fla.1996). There, in a similar employee leasing situation, the Court concluded that, because of the contractual and statutory obligations to pay the wages and payroll taxes, the IRS could look to both the employee leasing company and the client company for the payment of the taxes, but could only collect once. The court in that case called them "co-employers" of the workers.

TEC argues that Earthmovers is not applicable in this case for two reasons: (1) the conclusion that an employee leasing company and its client company are "co-employers" is dicta; and (2) this issue was not in dispute between the two companies in Earthmovers since the employee leasing company there agreed it was responsible for the payment of the taxes. TEC correctly asserts that the real issue in dispute in Earthmovers was whether the payroll taxes in question had actually been paid.

And, once the court made the factual finding that the taxes had been paid, the remaining reasoning of the court concerning the relationship of the parties is dicta. TEC is also correct that the employee leasing company in Earthmovers did not dispute its liability for the taxes. But, even if dicta, the Earthmovers opinion is well-reasoned and persuasive. For the reasons set forth below, this Court agrees with the reasoning set forth therein.

In the case at bar, TEC had "control" of the payment of wages to the employees as that term is used in § 3401(d)(1). Both the Florida Statutes and TEC's contract with AESI gave it responsibility for the payment of wages to the leased employees and full responsibility for the payment of payroll taxes. In the face of this clear responsibility, TEC seeks to avoid liability pursuant to the following arguments: (1) AESI, the client company, was the party that had actual control because TEC would not issue checks to the leased employees unless it first received payment from AESI; (2) the Florida statute (and the contract which uses the same wording) omits the phrase "without regard to payments by the client to the leasing company" as to the payment of payroll taxes; and (3) the parties modified their contract to reflect AESI's agreement that it was responsible for the payment of payroll taxes. These arguments will be addressed in turn.

First, TEC points to In re Professional Security Services, Inc. for support of its proposition that the client company is actually in control of the payment of wages because it must provide the funds in advance to the employee leasing company before the wages are paid. 162 B.R. 901 (Bankr.M.D.Fla.1993). While Professional Security Services does contain language to that effect, it does not hold that the employee leasing company is not also respon-

sible for the payment of payroll taxes. Its holding is that a common law employer cannot avoid its federal employment tax obligations merely by showing that the responsibility for performing the obligation had been assigned to a third party.

Other cases have addressed the meaning of the phrase "having control of the payment of such wages" and determined that it means the person or entity actually making payment or having control of the bank account from which payment is made. *See Otte v. United States,* 419 U.S. 43, 95 S.Ct. 247, 42 L.Ed.2d 212 (1974); *Southwest Restaurant Systems, Inc. v. IRS,* 607 F.2d 1237 (9th Cir.1979); *Consolidated Flooring Services v. United States,* 38 Fed.Cl. 450 (1997).

In *Otte,* a bankruptcy trustee contended that he was not the "employer" of the debtor's employees and was therefore not required to make withholdings when paying wage claims representing wages earned before bankruptcy. The Supreme Court determined that § 3401(d)(1) was intended to place responsibility for withholding at the point of control—the point of actual payment. It is the person that makes the payment (even a bankruptcy trustee) that is responsible for withholding the employee's income taxes. The Court noted that the same is true for FICA withholding. 26 U.S.C. § 3102(a) required FICA taxes to be collected by the employer "from the wages as and when paid." The Supreme Court concluded that the bankruptcy trustee was the employer in that context as well.

The Ninth Circuit in Southwest Restaurant Systems reached a similar conclusion. Southwest Restaurant Systems involved four separate corporations, one of which was in bankruptcy. The accounting and bookkeeping functions for all four corporations were handled by one bookkeeper who paid the wages for all four corporations from one payroll bank account maintained by the debtor. The payroll bank account was funded by checks drawn by the bookkeeper against funds from the separate accounts of each corporation. She computed the payroll based on time cards sent to her from each corporation. The wages were then paid from the debtor's bank account. Citing *Otte,* the Court determined that the person or entity making payment was "at the point of control" of that payment. Since the bank account was the debtors, the debtor was the "employer" under the statute. The Court further explained at p. 1240:

> The reason for this is clear. No one other than the person who has control of the payment of the wages is in a position to make the proper accounting and payment to the United States. It matters little who hired the wage earner or what his duties were or how responsible he may have been to his common law employer. Neither is it important who fixed the rate of compensation. When it finally comes to the point of deducting from the wages earned that part which belongs to the United States and matching it with the employer's share of FICA taxes, the only person who can do that is the person who is in "control of the payment of such wages."

The United States Court of Federal Claims, in Consolidated Flooring Services agreed and explained it this way:

> While the ability to hire, fire, and set the wages for an employee is relevant to determining who controls the wage of an employee, it is not relevant to determining—as § 3401(d)(1) requires to be determined—who controls the payment of wages...

> Only the party with control of the account from which wages are paid can, ultimately, control the amount of payment and whether payment actually oc-

curs. Further, the person who distributes wage payments from their account is the person best able to account for the amount of distributions to the employees, and to ensure that taxes are withheld on those payments. The Court holds, therefore, that the party with control over the payment of such wages under 26 U.S.C. § 3401(d)(1), is the party with control of the account from which wages are paid.

38 Fed.Cl. at 458–59.

TEC's second reason is likewise misplaced. TEC seeks comfort from the difference in the wording of the Florida Statute as it applies to wages as compared to payroll taxes. Florida Statutes § 468.525(4) states:

The employee leasing company's contractual arrangements with its client companies shall satisfy the following conditions, whereby the leasing company:

(b) Assumes responsibility for the payment of wages to the leased employees without regard to payments by the client to the leasing company.

(c) Assumes full responsibility for the payment of payroll taxes and collection of taxes from payroll on leased employees.

TEC argues that since the phrase "without regard to payments by the client to the leasing company" is missing from the requirement for the payment of payroll taxes, the State of Florida did not intend for employee leasing companies to be responsible for the payment of payroll taxes unless the employee leasing company first received sufficient funds from the client company with which to pay the taxes.

This argument fails for two reasons. First, the clear wording of the statute places full responsibility for the payment of payroll taxes on the employee leasing company and that responsibility is not conditioned on anything other than being an employee leasing company. Second, the employee leasing company has responsibility for the payment of wages without regard to payment by the client and, for the reasons explained above, the party which actually pays the wages is liable to the IRS for payroll taxes. This would be true even if the Florida Statutes made no mention of the responsibility for payroll taxes.

Lastly, TEC argues that it had an agreement with its client that, because the client was not paying the payroll taxes in advance, TEC would not make payment of payroll taxes to the IRS. TEC contends this agreement altered the requirement of the original contract that TEC was responsible for the collection and payment of payroll taxes. This reason fails, too.

■ What TEC refers to as an "addendum" to the contract, is actually two letters, one in March and one in April 2000, which purport to confirm an oral understanding that TEC was not remitting payroll taxes and that AESI would be responsible for them. But, this violates the Florida Statutes in two respects. All contractual agreements are required to be in writing and therefore the confirmation of an earlier verbal agreement would do nothing to relieve TEC of responsibility for the months of January, February and that portion of March prior to the first letter. And, instead of cancelling the employee leasing contract, the letters sought to relieve TEC of one portion of its responsibility under the contract, the responsibility for payroll taxes. This responsibility is a requirement placed upon all employee leasing companies by Florida statute. Any contract to the contrary would be in violation of the Florida statute and is void. *See Harris v. Gonzalez,* 789 So.2d 405 (Fla. 4th DCA 2001); *Park v. Wausau Underwriters Insurance Compa-*

*ny,* 547 So.2d 213 (Fla. 4th DCA 1989). Therefore, TEC's attempt to relieve itself of its responsibility for payroll taxes was ineffectual.

TEC's remedy was clearly spelled out in its contract which provides that:

> If for any reason payment is not made when due, Subscriber agrees that TEC will have the right to terminate its performance hereunder, withhold its employees services, and/or bring suit seeking damages. Upon termination of this agreement, for any reason, or should Subscriber fail to timely pay TEC for it services, all of the employees shall be deemed to have been laid off by TEC and immediate notification of this shall be provided by Subscriber to employees who have been leased pursuant to this agreement.

Service agreement at Section X., A.

TEC did not avail itself of this remedy. No notification was ever given to the employees that they were deemed laid off. TEC never ceased providing employer benefits such as health, disability and workers' compensation insurance. And, TEC continued to hold itself out as the employee leasing company for the employees. With this business relationship comes the statutory burdens, including the requirement to collect and pay payroll taxes.

■ This Court holds that, under the statutory framework in Florida, the client company in an employee leasing arrangement is the common law employer of the leased employees and the employee leasing company is the statutory employer. Both are responsible to the IRS for the withholding requirements on employee income and for the collection and payment of payroll taxes. As between the two, the client company bears ultimate responsibility and is liable to the employee leasing company when, like here, the employee leasing company pays or is held liable to the IRS.

It is therefore **ORDERED** and **ADJUDGED** that:

1. The United States' Motion to Consolidate (Dkt. # 12) is **GRANTED**. The Clerk is directed to consolidate *United States of America v. Total Employment Co., Inc.,* case number 8:03–cv–1921–T–30MAP with *Total Employment Co., Inc. v. United States of America,* case number 8:03–cv–2122–T–30TGW for all purposes. The Clerk is directed to administratively close case number 8:03–cv–2122–T–30TGW.

2. The Bankruptcy Court's Order is **REVERSED** and this case is **REMANDED** for further proceedings consistent with this Order.

3. The Clerk is directed to close this case and terminate all pending motions as moot.