MARY S. SCRIVEN, UNITED STATES DISTRICT JUDGE
*1146 THIS CAUSE comes before the Court for consideration of the cross motions for summary judgment: United States' Motion for Summary Judgment, (Dkt. 29), the response in opposition thereto, (Dkt. 31), Plaintiffs' Motion for Summary Judgment, (Dkt. 30), and the response in opposition thereto. (Dkt. 32) Therein the Parties seek to resolve the question of whether Gevity HR, Inc., along with its subsidiaries Gevity HR, LP, Gevity HR II, LP, Gevity HR III, LP, Gevity HR IV, LP, Gevity HR V, LP, Gevity HR VI, LP, Gevity HR VII, LP, Gevity HR XI LP, Gevity HR X, LP, Gevity HR XI, LLC, and Gevity HR XII, Inc. (collectively, "Gevity") was the statutory employer, as defined in 26 U.S.C. § 3401(d)(1), of its clients' employees.[1] Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court GRANTS Plaintiffs' Motion for Summary Judgment and DENIES the United States' Motion for Summary Judgment.
I. BACKGROUND
TriNet Group, Inc. ("TriNet" or "Plaintiff") is a professional employer organization ("PEO"). (Dkt. 28 at ¶ 1) In 2009, TriNet acquired Gevity. (Id. at ¶ 2) TriNet brings this action as a successor-in-interest to Gevity, regarding Gevity's federal income tax returns from 2004 through 2009. (Id. at ¶¶ 3-4) During these years, Gevity was a publicly traded company operating as a PEO. (Id. at ¶ 5) Gevity was headquartered in and licensed by the state of Florida as an employee leasing company under Florida Statutes §§ 468.520 -.535. (Dkt. 31 at ¶ 2) As a PEO, Gevity provided services to small and medium sized businesses, including payroll processing, employment tax services, access to health and welfare benefits, workers' compensation coverage, and human resource services. (Id. at ¶¶ 1, 3) With each client company, Gevity entered into a standardized professional services agreement ("PSA"), in which it agreed to perform those human resource and payroll services in exchange for a professional services fee. (Id. at ¶¶ 4, 6) Pursuant to the PSAs, the client companies remained responsible for:
• "Compensating employees for their work, providing benefits, and determining paid time-off policies;"
• "Hiring and termination decisions;"
• "Managing and supervising the day-to-day work of employees; providing training and development opportunities; and providing performance appraisals and appropriate salary adjustments;"
• "Delivering rewards and incentives;"
• "Informing employees of their benefit options;" and
• "Running [the] business and making business decisions."
(Id. at 8) Gevity was required under the PSAs to provide its clients with invoices for the amounts due each pay period. (Id. at ¶ 11) Gevity's invoices were payable immediately *1147 upon receipt. (Id. at ¶ 12) The amounts due included the gross wages of the clients' employees ("worksite employees"), including employment taxes, Gevity's service fee, employer contributions to any benefit plans, and fees for any other services not covered by Gevity's service fee. (Id. at ¶ 9) The PSAs specified that payment to Gevity must be made through "wire transfer, Automated Clearing House ("ACH") transfer, or other method acceptable to Gevity." (Id. at ¶ 10) Gevity's obligation to process and issue paychecks in accordance with its clients' instructions was typically provided in a separate schedule attached to the PSA. (Id. at ¶ 13) Some of the PSAs included form language in which Gevity agreed to pay the wages of the worksite employees without regard to payment from the client. (Id. ) With respect to employment taxes, Gevity agreed to comply with all laws and regulations and be responsible for and pay all costs related to "the reporting, collection and payment of federal and state [employment] taxes on wages paid" to worksite employees. (Id. at ¶ 14)
A. Gevity's Payroll Process
The worksite employees earned wages at least one week prior to the date that Gevity paid the wages (the "pay date"). (Id. at ¶ 18) Gevity required a representative of the client company to report to Gevity the number of hours each worksite employee worked, whether any new hires or terminations occurred, any changes in the rate of pay for each worksite employee, and any tips received by any worksite employee. (Id. at ¶ 19) Generally the representative reported this information the next business day following the closure of a pay period, which was two or three days before the pay date. (Id. ) The client company either entered this information into Gevity's electronic payroll system or Gevity entered it with the client's approval, if the client provided the information via fax or telephone. (Id. at ¶ 20) Once the payroll information was entered into Gevity's payroll system, Gevity calculated the payroll, including employment taxes, and generated an invoice and payroll register. (Id. at ¶ 21)
Clients paid Gevity's invoices in one of four ways: ACH debit, wire transfer, certified check, or company check. (Id. at ¶ 25) Approximately seventy-five percent of Gevity's client companies paid Gevity through ACH debit, which made it the most common method of payment. (Id. at ¶ 26) An inherent lag existed in Gevity's payroll process with respect to ACH debit payments. (Id. at ¶ 17) In ACH transactions, Gevity initiated a debit from the client company's account for the full payroll amount, including all wages, taxes, and fees two days prior to the pay date. (Id. at ¶ 27) Within one day of the ACH debit, Gevity received a "provisional credit" in its account that could be reversed at any time within a five business day period if the client company did not have sufficient funds to satisfy the debit or for certain other reasons, such as if the client company put a "stop payment" on the ACH debit or the client company's account was frozen. (Id. at ¶ 28) Gevity did not receive notice when the ACH debits cleared. (Id. at ¶ 29) If an ACH debit did not clear, however, Gevity would learn that the debit did not clear within three to five business days through a report that it requested from its bank that showed deposits that were returned for insufficient funds and for other reasons. (Id. ) In other words, Gevity would not know whether the ACH debit had cleared until at least one day after making the wage payments to the worksite employees. If the ACH debit did not clear, Gevity would then send the report to its client service team for collection. (Id. )
*1148 For payment by wire transfer, the client company initiated the wire transfer to Gevity's bank account upon receipt of the invoice. (Id. at ¶ 30) The wired funds were immediately available without a delay for the wire to clear. (Id. ) Clients that paid Gevity with certified checks or company checks provided those checks directly to a Gevity branch location. (Id. at ¶ 31) Funds paid by certified check were immediately available upon deposit without any delay for the check to clear. (Id. at ¶ 32) Funds paid by company check, however, were not immediately available and, similar to ACH debits, took three to five business days to clear. (Id. at ¶ 33)
Gevity paid wages to the worksite employees from its own bank accounts. (Id. at ¶ 15) The client companies did not have access to or authority over any of Gevity's bank accounts. (Id. at ¶ 16) Specifically, on the pay date, Gevity paid the net amount of each worksite employee's paycheck for each payroll period through either direct deposit via debit against Gevity's own bank accounts or a paper check drawn on Gevity's bank accounts. (Id. at ¶ 22) To complete its payroll process, Gevity deposited with the Internal Revenue Service ("IRS") federal employment taxes with respect to wages paid to the worksite employees in accordance with applicable federal laws and regulations. (Id. at ¶ 23) As required by the IRS's next-day deposit rules, Gevity remitted payroll taxes on an accelerated basis. (Id. at ¶ 24)
B. Gevity's Forms 941, Employer's Quarterly Federal Tax Returns
Gevity filed IRS Forms 941, Employer's Quarterly Federal Tax Returns for the tax quarters ending March 31, 2004 through June 30, 2009, ("Forms 941"), using its own name, address, and Employer Identification Number ("EIN"). (Dkt. 31 at ¶ 34) Therein, Gevity reported: (1) the number of employees, including worksite employees (Gevity's clients' employees) and non-worksite employees (Gevity's corporate employees), that received wages, tips, and other compensation for the tax period from Gevity; (2) the amount of wages, tips, and other compensation Gevity paid to the employees; (3) the federal income tax withheld from those wages, tips, and other compensation; (4) social security and Medicare taxes due on the reported wages, tips, and other compensation; and (5) the total tax due for the corresponding tax quarter. (Dkt. 28 at ¶ 10; Dkt. 31 at ¶ 35) Gevity was not required to and did not report that it operated as a PEO on the Forms 941. (Dkt. 28 at ¶ 12) During the years at issue, the IRS did not have any published procedures unique to PEOs for the processing of federal tax deposits or Forms 941. (Id. at ¶ 25) The IRS processed Gevity's Forms 941 without making a determination as to the accuracy of the information reported therein or making a determination of whether Gevity was a common law employer or statutory employer. (Dkt. 31 at ¶ 36; Dkt. 28 at ¶ 32)
Gevity made federal tax deposits of the payroll taxes reported on the Forms 941 during the years at issue using its own name and EIN. (Dkt. 31 at ¶ 41) A taxpayer such as Gevity with accumulated federal employment tax above a threshold amount of $ 100,000 or more a day during a deposit period, was required to make next-day deposits, as opposed to monthly or semi-weekly deposits. (Dkt. 28 at ¶¶ 16-17) During the quarterly tax periods at issue, the IRS accepted tax deposits from Gevity, including the next-day deposits, submitted through the Electronic Federal Tax Payment System ("EFTPS") or deposited with a financial institution authorized to accept federal tax deposits. (Id. at ¶ 18) Gevity made the EFTPS tax deposits from its own bank accounts. (Id. at ¶ 21)
*1149 C. FICA Tip Credit
Gevity also filed Forms 1120, U.S. Corporation Income Tax Returns, for the 2004 through 2009 tax years. (Id. at ¶ 45) To claim the employer social security tax credit provided in 26 U.S.C. § 45B (the "FICA tip credit"), Gevity attached Forms 3800, General Business Credit and Forms 8846, Credit for Employer Social Security and Medicare Taxes Paid on Certain Employee Tips. (Id. at ¶ 46) During the tax years at issue, Gevity claimed for itself, not as a pass through to its clients, the FICA tip credit with respect to worksite employees who received tip income at 274 to 477 client companies per year. (Id. at ¶ 47) In total, Gevity claimed the FICA tip credit in connection with the payroll taxes that it paid for over 1,170 individual client companies. (Id. ) The IRS processed these forms without challenging their accuracy or making any determination as to whether Gevity was a common law employer or a statutory employer. (Id. at ¶¶ 48-50) Gevity rebated some of the FICA tip credit it received back to the client companies for which it provided payroll services to during the years at issue.[2] (Dkt. 29 at 7; Dkt. 35 at 5 n.4)
Eventually, the IRS examined Gevity's tax filings and disallowed the FICA tip credits claimed by Gevity during the years at issue based on its determination that Gevity was not the common law employer or statutory employer of the worksite employees for FICA tax purposes. (Dkt. 31 at ¶ 53) Thus, the IRS issued notices of deficiency to Gevity for the tax years at issue with respect to the FICA tip credits. (Id. at ¶¶ 54-55) Gevity promptly paid these amounts by check to avoid the IRS's collection actions. (Id. at ¶ 57) Gevity then filed IRS Forms 1120-X, Amended U.S. Corporation Income Tax Return seeking refunds of the amounts paid. (Id. at ¶ 58) The IRS disallowed Gevity's claims for refunds. (Id. at ¶ 59)
On June 28, 2016, within two years of the IRS' disallowing the refund claims at issue, Gevity brought this action seeking a refund of an alleged overpayment of federal income tax in the amount of $ 10,567,468, plus interest. (Dkts. 1, 31 at ¶ 61) On February 27, 2018, the Parties filed cross motions for summary judgment to determine the issue of whether Gevity was a statutory employer for purposes of claiming the FICA tip credit. (Dkts. 29, 30) For the reasons that follow, the Court finds that Gevity was the statutory employer of the worksite employees during the relevant time period.
II. STANDARD OF REVIEW
Summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fennell v. Gilstrap, 559 F.3d 1212, 1216 (11th Cir. 2009) (citing Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1356 (11th Cir. 2007) ). Which facts are material depends on the substantive law applicable to the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).
Evidence is reviewed in the light most favorable to the non-moving party. Fennell, 559 F.3d at 1216 (citing Welding Servs., Inc., 509 F.3d at 1356 ). A moving *1150 party discharges its burden on a motion for summary judgment by showing or pointing out to the Court that there is an absence of evidence to support the non-moving party's case. Denney v. City of Albany, 247 F.3d 1172, 1181 (11th Cir. 2001) (citation omitted).
When a moving party has discharged its burden, the non-moving party must then designate specific facts (by its own affidavits, depositions, answers to interrogatories, or admissions on file) that demonstrate there is a genuine issue for trial. Porter v. Ray, 461 F.3d 1315, 1320-1321 (11th Cir. 2006) (citation omitted). The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value."). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact ... the court may grant summary judgment if the motion and supporting materials ... show that the movant is entitled to it." Fed. R. Civ. P. 56(e).
"The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." S. Pilot Ins. Co. v. CECS, Inc., 52 F.Supp.3d 1240, 1242-43 (N.D. Ga. 2014) (citing Am. Bankers Ins. Group v. United States, 408 F.3d 1328, 1331 (11th Cir.2005) ). "Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts." Id. at 1243 (citing United States v. Oakley, 744 F.2d 1553, 1555-56 (11th Cir.1984) ).
III. DISCUSSION
The FICA tip credit is a non-refundable tax credit provided to employers in the food and beverage industry with respect to FICA taxes paid on tip income. 26 U.S.C. § 45B. Under § 45B of the Internal Revenue Code ("IRC"), an employer may claim the FICA tip credit if it paid or incurred FICA taxes on tips that were "received from customers in connection with the providing, delivering, or serving of food or beverages for consumption if the tipping of employees for delivering or serving food or beverages by customers is customary." Id.; (Dkt. 29 at 13-14; Dkt. 30 at 14) A taxpayer qualifies as an "employer" for purposes of claiming the FICA tip credit if the taxpayer is either the common law employer or meets the statutory definition of employer under § 3401(d)(1). See Otte v. United States, 419 U.S. 43, 50-51, 95 S.Ct. 247, 42 L.Ed.2d 212 (1974) (extending § 3401(d)(1)'s definition of employer for income tax withholding to the FICA withholding provisions). The Parties agree that Gevity was not a common law employer of the worksite employees, (Dkt. 29 at 15; Dkt. 33 at 11 n.5), but they dispute whether Gevity qualifies as a statutory employer under § 3401(d)(1). If Gevity is a statutory employer and otherwise satisfies the requirements of § 45B, TriNet, as Gevity's successor-in-interest, will be entitled to a refund. (Dkt. 29 at 14; Dkt. 30 at 14)
Section 3401(d)(1) of the IRC provides that
the term "employer" means the person for whom [the worksite employee] performs or performed any service ... except that ... if the person for whom the [worksite employee] performs or performed the services does not have control *1151 of the payment of the wages for such services, the term "employer" ... means the person having control of the payment of such wages[.]
26 U.S.C. § 3401(d)(1).
Plaintiff argues that Gevity was the § 3401(d)(1) statutory employer during the years at issue because it had sole control over the bank accounts from which the worksite employees' wages were paid, and the client companies had no access to or authority over those accounts. (Dkt. 30 at 16) It is undisputed that Gevity had sole access to and control over the bank accounts from which the wages were paid. (Dkt. 31 at ¶¶ 15, 16) Plaintiff points to Paychex Business Solutions, LLC v. United States, No. 8:15-cv-1455-T24-TGW, 2017 WL 2692843, (M.D. Fla. June 22, 2017), reconsideration denied, No. 8:15-cv-1455-T24-TGW, 2018 WL 1605841 (M.D. Fla. Apr. 3, 2018),[3] which found that a PEO met the definition of a statutory employer under nearly identical circumstances to the case at hand. (Dkt. 30 at 15)
In Paychex, Florida-licensed PEOs sought refunds for overpayments of the employer's portion of Social Security taxes for several tax periods from 2009 through 2012. Paychex, 2017 WL 2692843, at *3. The parties filed cross motions for summary judgment, and the central issue was whether plaintiffs were the statutory employers of their clients' worksite employees under § 3401(d)(1). Id. at *4. The court found that "[t]he trend in the case law shows that the person or entity that controls the bank account from which wages are paid is the § 3401(d)(1) statutory employer." Id. Thus, the court held that plaintiffs were the statutory employers of the worksite employees because they "actually controlled the accounts from which the wage payments were made. The client companies had no authority over, or access to, these bank accounts." Id. at *7.
In its analysis, the Paychex court expressly rejected the Government's argument that the plaintiffs were merely conduits for the client companies' funds because the clients' accounts were debited for the funds used to pay the wages of the worksite employees prior to payment being made and because the wage payments were contingent on or proximately related to prior receipt of the client companies' funds. Id. In addition to this timing argument being inconsistent with the reasoning of prior cases, the court noted that plaintiffs
were not able to confirm that the client companies that paid via ACH had sufficient funds in their accounts prior to Plaintiffs making the wage payments to the worksite employees, and this uncertainty regarding the sufficiency of the client companies' funds prior to [p]laintiffs making the wage payments undercuts [the Government's] conduit and control arguments.
Id.
The Paychex court also rejected the Government's argument that "exclusive control [over the wage payments] is missing because the wage payments were contingent on or proximately related to prior receipt by [p]laintiffs of the client companies' funds." Id. (emphasis in original). The court found that the correct inquiry was "whether the plaintiffs had exclusive control over the accounts from which the payments were made," not whether they had exclusive control over the wage payments generally. Id.
*1152 Finally, the Paychex court rejected the Government's request that it disregard United States v. Total Employment Co. Inc., 305 B.R. 333 (M.D. Fla. 2004), and rely on two earlier cases, United States v. Garami, 184 B.R. 834 (M.D. Fla. 1995) and In re Professional Security Services, 162 B.R. 901 (Bankr. M.D. Fla. 1993). Id. at *8. Garami and In re Professional Security Services both held that the common law employer was liable for unpaid employment taxes, despite the existence of a contractual agreement with a third party to pay such taxes on its behalf. Garami, 184 B.R. at 838 ("Although Sunshine contractually agreed to pay the employment taxes of Tidy Maid's cleaners, such an agreement does not relieve the actual employer, Tidy Maid, of the obligation to pay those taxes."); In re Prof'l Sec. Servs., Inc., 162 B.R. at 904 ("The law is clear that the person assessed cannot establish that he is not the person responsible merely by showing that he delegated the taxing responsibility to someone else, for the holding of employees' taxes is considered an important fiduciary duty that cannot be delegated. The existence of other responsible parties who also control disbursement and have the requisite status, duty, and authority does not relieve the party assessed of his own responsibility.").
In Total Employment, the court endorsed a "co-employer" theory, finding that, in addition to the common law employer, an employee leasing company was also an "employer" of the leased employees for tax purposes when it had control of the payment of wages under § 3401(d)(1). 305 B.R. at 338. Further, the Total Employment court expressly rejected the argument that the client company is actually in control of the payment of wages for purposes of § 3401(d)(1) when it must provide the funds in advance to the employee leasing company before the wages are paid. Id. at 338-39. Rather, the Total Employment court found that the proper inquiry regarding who controlled the payment of the wages under the statute was which entity was "actually making payment or having control of the bank account from which payment is made." Id. at 339. The Paychex court agreed with the reasoning of Total Employment, noting that the holdings of Garami and In re Professional Security Services do "not undercut the holding[ ] ... that the IRS can also look to the § 3401(d)(1) statutory employer for payment of unpaid employment taxes." Paychex, 2017 WL 2692843, at *9 (emphasis added).
A. Paychex Was Not Wrongly Decided
The Government urges this Court to disregard the Paychex decision claiming it was wrongly decided. More specifically it argues that Gevity does not fit the definition of a § 3401(d)(1) employer because the client companies, and not Gevity, controlled the payment of the worksite employees' wages during the years at issue. (Dkt. 29 at 15-16) The Government argues that Gevity, as a PEO, was merely a conduit for the wage and employment tax payments of its client companies. (Id. at 16) In support, the Government points out that, according to the PSAs, the client companies, or the common law employers, were responsible for, inter alia, "compensating employees for their work" and providing Gevity with funds to pay the worksite employees and associated taxes prior to or on the date that the wages were paid. (Id. at 16) The Government argues that Gevity's policy was not to complete the delivery process of payrolls to clients until funding was first received; therefore, the client companies had control over the wage payments. (Id. at 16) Although these arguments were addressed in Paychex, the Government provides four reasons to support *1153 its contention that this Court should not follow the Paychex reasoning.
First, the Government argues that Paychex broadens § 3401(d)(1) beyond its intended scope by allowing it to extend beyond "special or unusual circumstances" to "common, routine business practices, such as the use of a PEO to issue paychecks and remit employment taxes." (Id. at 18) The Government cites to the Code of Federal Regulations § 31.3401(d)-1, and the example provided therein, to support this argument. Section 31.3401(d)-1(f) states as follows:
If the person for whom the services are or were performed does not have legal control of the payment of the wages for such services, the term employer means (except for the purpose of the definition of wages ) the person having such control. For example, where wages, such as certain types of pensions or retired pay, are paid by a trust and the person for whom the services were performed has no legal control over the payment of such wages, the trust is the employer.
26 C.F.R. § 31.3401(d)-1(f) (emphasis in original). Section 31.3401(d)-1(h) of the regulations also states that "[t]he special definitions of the term employer in ... this section are designed solely to meet special and unusual situations." Id. at § 31.3401(d)-1(h) (emphasis in original). Thus, the Government contends that § 3401(d)(1) applies only in the special or unusual situation in which a common law employer does not have legal control of the funds because it "relinquishes complete control over the funds used to pay wages to a third party." (Dkt. 29 at 18) Notably, the example from the regulation does not define "legal control." Further, as pointed out by Plaintiff, the Government does not cite any authority that prohibits a PEO making wage payments for worksite employees of a client company from its bank accounts, over which the client company has no control, from being a special and unusual circumstance as contemplated by the regulation. (Dkt. 33 at 12-13) Plaintiff also notes that retirement and pension trusts, like PEOs, are not uncommon and are generally required to be prefunded by employers. (Id. ) Thus, the Government's "special and unusual circumstances" argument does not persuade the Court that Paychex was wrongly decided.
Second, the Government contends that the Court in Paychex erroneously disregarded the timing of the plaintiffs' receipt of funds from their clients when it limited the inquiry solely to whether the plaintiffs controlled the bank account from which wages are paid. (Dkt. 29 at 19) As argued by the Government, control over the bank account is merely a relevant factor when determining whether a taxpayer is a § 3401(d)(1) employer, and not dispositive of the employer inquiry. (Id. ) Rather, the Government argues that Gevity is the statutory employer "only if it paid wages prior to and without regard to payment from its clients." (Dkt. 29 at 21) The Government points to Garami and In re Professional Security Services in support of the proposition that "when a third party receives payment from the common law employer prior to or contemporaneously with the payment of wages, courts have held that third party is not the § 3401(d)(1) employer." (Dkt. 29 at 20) However, as explained in Total Employment, this argument misstates the holdings of Garami and In re Professional Security Services, which found only that the common law employer remains liable when it contracts with a third party to pay employment taxes. Those cases did not find that a third party was not also liable if it were deemed to be the § 3401(d)(1) employer. The timing argument was not disregarded by Paychex; rather, it was squarely considered and rejected by the court as discussed above. See *1154 Paychex, 2017 WL 2692843, at *7. The Court follows Paychex's well-reasoned analysis on this issue.
The Government also cites Winstead v. United States, 109 F.3d 989 (4th Cir. 1997), to support its timing argument. (Dkt. 29 at 19-20) Winstead involved sharecropping agreements whereby a landowner paid the wages of his tenant farmers' day laborers from his account directly and subsequently deducted those wages from the tenant farmers' share of the profits once the crop was sold. Winstead, 109 F.3d at 990. In determining whether the landowner was the § 3401(d)(1) employer, however, the Fourth Circuit did not appear to consider the fact that wage payments were made prior to the landowner's receipt of funds from the tenant farmers. Id. Rather, the court reasoned that "[s]ince Winstead paid the day laborers directly from his checking account and the sharecroppers had no authority over this account, he would appear to fit squarely within the 3401(d)(1) exception." Id. at 991. Thus, the Government's reliance on Winstead is misplaced, and this case actually supports Plaintiff's argument that an entity that has control over the accounts from which wages are paid can be deemed a statutory employer.
Even if the Court were to accept the Government's argument that timing of the wage payments relative to payment by the clients is a factor in the Court's determination, the Court finds that under the facts of this case, Plaintiff would still qualify as the statutory employer. Although Gevity's policy was clearly and admittedly to try to obtain payment from its client companies prior to or as close as possible to payment of wages to employees, (Dkt. 33 at 5), it is undisputed that, like the plaintiffs in Paychex, Gevity's ACH transactions resulted in an "inherent lag" in which Gevity was vulnerable to non-payment in over seventy-five percent of its transactions. (Dkt. 31 at ¶¶ 17, 26-29) Specifically, in ACH debit transactions, which made up approximately seventy-five percent of transactions, Gevity debited the client companies' accounts two days prior to the pay date, and it did not learn whether the ACH debits had cleared until three to five days later. (Id. at ¶¶ 26-29) Thus, Gevity paid the worksite employees' wages at a minimum of one day prior to confirming that payment had cleared. If payment did not clear, Gevity proceeded to collect from the client companies, with no guarantee of success. (Id. at ¶ 29) Thus, in practice, Gevity frequently paid the worksite employees in advance of cleared payment by the client companies.[4]
*1155 Third, the Government argues that Paychex ignores the economic reality that the client companies controlled the payment of wages because they were the source of the funds from which the wages were paid. (Dkt. 29 at 22-23) Since the client companies provided Gevity with the funding prior to the pay date, the Government argues that Gevity was merely a conduit for the employer's wage payments. (Id. ) This "mere conduit" argument was addressed and rejected by Paychex, which relied on the analyses of Total Employment, as well as a Second Circuit decision, Educational Fund of the Electrical Industry v. United States, 426 F.2d 1053, 1057 (2d Cir. 1970) (rejecting a similar "mere conduit" argument). Without any authority to support the Government's position that the source of the funding is relevant to the Court's inquiry on this matter, the Court declines to adopt it.
The Government also rehashes its "exclusive control" argument, addressed by the court in Paychex. Specifically, the Government contends that if the common law employer and a third party share control over the payment of wages, there can be no § 3401(d)(1) employer. (Dkt. 32 at 11-13) In support, the Government relies on Century Indem. Co. v. Riddell, 317 F.2d 681 (9th Cir 1963), but again this reliance is misplaced. In Riddell, the Ninth Circuit found that a third-party surety was not a statutory employer for tax purposes when the surety made job payments from a joint account to which a contractor, which was the common law employer, also had access. 317 F.2d at 691. The Ninth Circuit reasoned that
[j]oint control of a trust account into which all contract payments are required to be deposited, even from the inception of a contract job as in this case, which still leaves the common law employer in control of all the incidents of employment except the requirement of the concurrence of its bonding surety on checks for withdrawals from such account, does not have the dual effect ... of establishing (1) that the contractor 'does not have control of the payment of the wages', and (2) that the surety, whose concurrence is required, does have such 'control of the payment of such wages.' Here, neither has sole control, but neither is the subcontractor without any such control.
Id. Since both the common law employer and the third-party surety had joint access to and control over the accounts from which payments were made, the surety was not the statutory employer. Id. Thus, Riddell merely held that a common law employer could not absolve itself from its general tax responsibilities by its voluntary action of giving a third party joint control over an account into which job payments are to be made. Id. Riddell did not foreclose the possibility that in a situation where the third party had exclusive control over the account from which the wages were paid, both a common law employer and a statutory employer could be the "employer" for federal tax purposes. Thus, Riddell is in line with the holding in Paychex .
Finally, the Government argues that Paychex should be disregarded because it relies on Total Employment, which, according to the Government, "erroneously *1156 relied on state law to conclude that an employee leasing company was a statutory employer" and "erroneously endorsed the 'co-employment' model." (Dkt. 29 at 23-24) This argument lacks merit. Total Employment did address an argument raised by the defendant based on the language of Florida Statute § 468.525 and did discuss the obligations of Florida-licensed employee leasing companies to contractually assume responsibility for the payment of wages and payroll for their clients. 305 B.R. at 340. However, its ultimate finding that an employee leasing company was the statutory employer was also based on a thorough analysis of federal case law interpreting § 3401(d)(1). Id. at 337-40. Among others, Total Employment relied on a case from the United States Court of Federal Claims, Consolidated Flooring Services v. United States, which expressly stated "that the party with control over the payment of such wages under 26 U.S.C. § 3401(d)(1), is the party with control of the account from which wages are paid." Id. at 340 (quoting Consol. Flooring Servs. v. United States, 38 Fed.Cl. 450, 459 (1997) ). Again, the Court follows the well-reasoned analysis of Paychex, Total Employment, and the relevant cases cited therein.
Thus, for the reasons discussed, the Court follows the well-reasoned analysis of Paychex and holds that Gevity was the statutory employer under § 3401(d)(1).
B. The Certified Professional Employer Organization Statutes
In its reply in support of its Motion for Summary Judgment, the Government raises an additional argument to support its position that Gevity is not a § 3401(d)(1) statutory employer based on the 2014 enactment of §§ 3511 and 7705 of the IRC, which create the certified professional employer organization ("CPEO"). (Dkt. 34 at 8-10) Under this statutory and regulatory framework, a CPEO is an organization certified by the IRS as meeting certain requirements and is permitted to hold itself out as such. 26 U.S.C. §§ 3511, 7705. Although CPEOs are recognized as employers for federal tax purposes, they are not entitled to many of the tax credits that are available to common law employers, including the FICA tip credit. 26 U.S.C. § 3511(d) ("such credit with respect to a work site employee performing services for the customer applies to the customer, not the [CPEO.]"). From this, the Government apparently infers that Congress was evincing an intent to preclude all PEOs from receiving the FICA tip credit. This argument is unavailing.
First, the statute is silent regarding whether non-certified PEOs or other entities that otherwise meet the definition of a statutory employer under § 3401(d)(1) are precluded from claiming the FICA tip credit. Instead, the statute speaks volumes of Congress's ability to preclude an entity from benefitting from the tip credit: when that is Congress's intent, it simply says so in its statutes and rules. See 26 U.S.C. § 3511(d).
The Government next argues that the CPEO framework will be undermined if the Court finds that a PEO that controls the account from which wages are paid is the § 3401(d)(1) employer. (Dkt. 34 at 8-10) Specifically, the Government contends that if the Court holds that Gevity was a statutory employer for purposes of collecting the FICA tip credit, this will result in both non-certified PEOs and CPEOs being recognized as "employers" for federal tax purposes, with PEOs being able to claim tax credits that CPEOs are not able to claim. (Id. ) Thus, the Government argues that PEOs will have little incentive to seek CPEO status. The Court rejects this argument as well.
*1157 Preliminarily, the Court notes that the CPEO statutes are new pronouncements of law that became effective on December 19, 2014, significantly post-dating the relevant time period in the instant case, 2004 to 2009. 26 U.S.C. §§ 3511, 7705. Nowhere within the statutory framework does it state that these provisions apply retroactively. Ordinarily there is a presumption "against retroactive legislation, under which courts read laws as prospective in application unless Congress has unambiguously instructed retroactivity." Vartelas v. Holder, 566 U.S. 257, 266, 132 S.Ct. 1479, 182 L.Ed.2d 473 (2012) (citing Landgraf v. USI Film Products, 511 U.S. 244, 263, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) ). The Government seemingly recognizes this and offers no argument on this point. Thus, even if the statutes do apply to PEOs directly or indirectly, which they do not, because they post-date the relevant time period in this case and it does not appear that Congress intended them to apply retroactively, they are of no concern to resolution of this matter. See Rivers v. Roadway Exp., Inc., 511 U.S. 298, 313, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994) ("Even when Congress intends to supersede a rule of law embodied in one of our decisions with what it views as a better rule established in earlier decisions, its intent to reach conduct preceding the "corrective" amendment must clearly appear.").
Moreover, the fact that Congress expressly delineated that CPEOs are not entitled to the FICA tip credit suggests that absent such a proscription they would, by their characteristics, be entitled to receive the credit. Absent such a statutory limitation on PEOs, courts are left to examine whether such entities have control of the payment of the wages under § 3401(d)(1) in order to determine whether an entity is an "employer" entitled to claim the FICA tip credit. If an entity does exhibit the requisites and is not otherwise prohibited from receiving the FICA tip credit, it is entitled to receive it. See 26 U.S.C. § 45B ; (Dkt. 29 at 13-14; Dkt. 30 at 14). Plainly, the CPEO statutes post-date the relevant time period in this case, have no retroactive preclusive application, and do not apply to a non-CPEO such as Gevity.[5]
IV. CONCLUSION
Accordingly, for the foregoing reasons, the Court finds that Gevity was the § 3401(d)(1) employer of its clients' employees from 2004 to 2009. As such, it is hereby ORDERED as follows:
1. Plaintiff's Motion for Summary Judgment, (Dkt. 30), is GRANTED as to the issue of whether Gevity was the § 3401(d)(1) employer.
2. Defendant's Motion for Summary Judgment, (Dkt. 29), is DENIED .
3. Within fourteen (14) days of the date of this Order, the Parties shall either file a joint stipulation as to the remaining issues or advise the Court which, if any, issues remain to be tried. Thereafter, the Court will reset the pretrial deadlines, if necessary.
DONE and ORDERED in Tampa, Florida, this 17th day of September, 2018.

Plaintiff no longer seeks summary judgment on the issue of the amount of tax refund owed, as the Parties have agreed that they will stipulate to this if the Court decides that Gevity was a statutory employer for the years at issue. (Dkt. 35 at 10)

During the years at issue, Plaintiff represents that $ 5,516,040 of the FICA tip credit was rebated to the client companies. (Dkt. 35 at 5 n.4) The Government acknowledges that Gevity refunded the FICA tip credits claimed to some of its larger clients as a marketing strategy to close sales and retain relationships. (Dkt. 29 at 7)

The Government appealed the Paychex decision and subsequently voluntarily dismissed that appeal without explanation. (Dkt. 40-1) The Government informed the Court that its dismissal of the appeal in Paychex has "no impact on its position in this matter," and it maintains that Paychex was wrongly decided. (Dkt. 41)

Plaintiff also contends that Gevity was legally required to pay wages to the worksite employees without regard to whether it would be reimbursed by the client companies under Florida Statute § 468.525. (Dkt. 30 at 5) Florida Statute § 468.525(4)(b)-(c) provides as follows:
The employee leasing company's contractual arrangements with its client companies shall satisfy the following conditions, whereby the leasing company:
...
(b) Assumes responsibility for the payment of wages to the leased employees without regard to payments by the client to the leasing company.
(c) Assumes full responsibility for the payment of payroll taxes and collection of taxes from payroll on leased employees.
Fla. Stat. § 468.525(4)(b)-(c). While it is undisputed that Gevity was licensed under this statute, the Government disputes that Gevity PSAs actually included these obligations. It points out that only some of Gevity's PSAs contained language requiring Gevity to pay wages regardless of payment from the client, and the PSAs that did contain this language were internally inconsistent because they also provided that Gevity could remove a worksite employee from its payroll if a client company informed Gevity that it was unable to pay. (Dkt. 32 at 3-4) The Court finds that whether Gevity was statutorily or contractually obligated to pay the wages without regard to the client companies prior payment is immaterial because the Court has already found that this was, in fact, Gevity's practice due to the payroll lag which occurred by default in most of Gevity's transactions as discussed. Moreover, whether Gevity paid the worksite employees' wages prior to and without regard to payment by its client companies is not the standard for determining whether Gevity had "control of the payment of such wages" under § 3401(d)(1).

It appears that this argument was not raised by the Government in Paychex, as the CPEO statutes are mentioned for the first time by the Paychex court in a footnote in its order denying the Government's motion for reconsideration. Paychex Bus. Sols., LLC v. United States, No. 8:15-cv-1455-T24-TGW, 2018 WL 1605841, at *2 n.1 (M.D. Fla. Apr. 3, 2018).